**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF TEXAS**

**FORT WORTH DIVISION**

ANGELLA EVERETT,

Plaintiff,

v.

NOVO PLATFORM INC.,

Defendant.

**Civil Action No. 4:26-cv-00150-O-BP**

**DEMAND FOR TRIAL BY JURY**

# PLAINTIFF'S FIRST AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

**Use of Generative Artificial Intelligence**

Portions of this First Amended Complaint were prepared with the assistance of generative artificial intelligence. The undersigned has personally reviewed this First Amended Complaint, has independently verified the factual assertions against her own knowledge and the documents referenced herein, and is responsible for its contents in compliance with Federal Rule of Civil Procedure 11.

Plaintiff Angella Everett ("Plaintiff"), known during her engagement and employment with Defendant as "Angel," appearing in propria persona, complains of Defendant Novo Platform Inc. ("Novo" or "Defendant") and alleges as follows:

## I. INTRODUCTION

1. Plaintiff Angella Everett brings this action against Defendant Novo Platform Inc. for disability discrimination, failure to accommodate, retaliation, and disability-based hostile work environment in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and for disability discrimination, retaliation, and failure to accommodate under Texas Labor Code Chapter 21.

2. This case arises from Defendant's treatment of Plaintiff after she disclosed a traumatic brain injury and chronic migraines: a demotion styled as a "merger," escalating discipline for medically documented absences, a "Final Warning" issued hours into a sick day that Defendant's own contemporaneous email concedes was compounded by Defendant's own failure to deliver required equipment, a written HR narrative of unexcused "no call/no show" absences directly contradicted by that same HR representative's own prior email, denial and delay of Plaintiff's accommodation requests, and termination of Plaintiff's employment while she was on Defendant-recognized, insurer-approved disability leave.

3. This First Amended Complaint is filed pursuant to the Court's Order of July 16, 2026 (ECF No. 19), which granted Plaintiff leave to amend and directed that the amended complaint be filed as a standalone document containing all allegations and attachments on or before August 6, 2026. This First Amended Complaint supersedes and replaces the original Complaint (ECF No. 1) in its entirety.

## II. JURISDICTION AND VENUE

4. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this action arises under the ADA, 42 U.S.C. § 12101 et seq.

5. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's related claims under Texas Labor Code Chapter 21, because those claims arise from the same case or controversy and share a common nucleus of operative fact with Plaintiff's federal claims.

6. Venue is proper in this District under 28 U.S.C. § 1391 because Plaintiff worked remotely from within this District throughout her engagement and employment with Defendant, and a substantial part of the events and omissions giving rise to the claims asserted occurred within this District.

## III. PARTIES

7. Plaintiff Angella Everett is an individual who was domiciled in Tarrant County, Texas, and worked remotely from within this District at all times relevant to this action.

8. Defendant Novo Platform Inc. is an employer within the meaning of the ADA and Texas Labor Code Chapter 21, employing, on information and belief, fifteen or more employees, and conducts business in Texas, including employing remote workers located within this District. Defendant maintains offices including in New York City, New York — the primary source of Plaintiff's work direction — and in Miami, Florida.

## IV. ADMINISTRATIVE EXHAUSTION

9. On July 23, 2024, Plaintiff filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), dual-filed with the Texas Workforce Commission Civil Rights Division ("TWCCRD"), bearing Charge No. 520-2024-02399, against Defendant. (Exhibit 1.)

10. In that sworn Charge, Plaintiff stated: *"This gives me fear of retaliation when I return from short term disability leave."* Defendant terminated Plaintiff's employment on November 15, 2024, while Plaintiff was on that same disability leave. Plaintiff's retaliation and termination-related allegations in this First Amended Complaint grow out of, and are reasonably related to, the charge Plaintiff filed and swore to on July 23, 2024.

11. The EEOC issued a document titled "Determination and Notice of Rights," Issued On: 08/18/2025. (Exhibit 2.)

12. On Monday, August 18, 2025, at 4:26 PM, Plaintiff received an email transmitting the EEOC's Determination and Notice of Rights at her email address, aevere04@gmail.com. (Exhibit 3.)

13. The 90-day period for filing suit following receipt of the Determination and Notice of Rights commenced on August 18, 2025, and expired on Sunday, November 16, 2025. Because that date fell on a Sunday, under Federal Rule of Civil Procedure 6(a)(1)(C) the period extended to Monday, November 17, 2025.

14. Plaintiff never requested, and never received, a notice of right to file a civil action from the TWCCRD arising from Charge No. 520-2024-02399. No such notice was ever issued to Plaintiff.

15. Alex Stewart, Employment Intake Supervisor for the TWCCRD, confirmed in writing that Plaintiff's charge *"was filed with the EEOC. As such, the TWCCRD had no oversight of the investigation or records of the matter,"* and that *"[t]he state right to file civil action based on the dual filing would only have been issued if it was requested by the Charging Party."* (Exhibit 9.)

16. Under Texas Labor Code § 21.252(d), the failure to issue a notice of a complainant's right to file a civil action does not affect the complainant's right to bring a civil action against the respondent. Under Texas Labor Code § 21.254, the 60-day period to file suit runs only from receipt of a state notice of right to file — a notice that was never requested and never issued here, so that period has never begun to run. Under Texas Labor Code § 21.256, a civil action must be filed not later than the second anniversary of the date the complaint was filed with the TWCCRD — here, July 23, 2024, making the outer limit July 23, 2026. Plaintiff's original Complaint in this action was filed February 12, 2026, more than five months inside that two-year period.

## V. TIMELINESS AND EQUITABLE TOLLING

17. Plaintiff's original Complaint (ECF No. 1) was timely for the independent reasons set forth below, and to the extent Defendant disputes timeliness, Plaintiff pleads equitable tolling on each of three independent grounds.

### *A. Timely dispatch within the 90-day window*

18. On November 17, 2025 — the last day of the 90-day period described in Paragraph 13 above — Plaintiff mailed her original Complaint for Damages and Equitable Relief to the Clerk of this Court via United States Postal Service Certified Mail.

19. The postage receipt and certified mail receipt, both dated November 17, 2025, confirm the date of mailing. The USPS return receipt card, completed by Plaintiff in her own handwriting bearing her correct mailing address, was signed by the Clerk's Office upon receipt on November 19, 2025. (Exhibits 4, 5.)

20. Plaintiff does not contend, and has never contended, that mailing constitutes filing. Plaintiff pleads that her diligent, deadline-day dispatch by certified mail, followed by the Clerk's

actual receipt within the ordinary transit window, supports equitable tolling for the brief gap between dispatch and the Clerk's docketing, particularly because Plaintiff had no means of electronic filing at that time.

***B. The recorded address error and its consequences***

21. Plaintiff's original Complaint was received and filed by the Court on November 20, 2025, and assigned Case No. 4:25-cv-01312-O-BP (the "First Action").

22. Although Plaintiff provided her correct mailing address on the mailing envelope, on the enclosed cover letter, and on the return receipt card she completed in her own handwriting, the Court's mailed orders requiring action on her part never reached her.

23. On November 24, 2025, the Magistrate Judge issued an Order and Notice of Deficiency in the First Action directing Plaintiff to pay the filing fee or complete a long-form in forma pauperis application by December 8, 2025. That order never reached Plaintiff.

24. Because that order never reached her, Plaintiff had no knowledge of the deficiency, the cure deadline, or the requirement to submit the long-form application. Plaintiff's non-receipt was not the product of choice or neglect.

25. On December 15, 2025, the Magistrate Judge issued Findings, Conclusions, and a Recommendation to dismiss the First Action without prejudice under Rule 41(b). That document likewise never reached Plaintiff.

26. On December 18, 2025, at approximately 2:17 PM, concerned that she had heard nothing from the Court since her filing, Plaintiff telephoned the Clerk's Office. During that call, a member of the Clerk's Office staff confirmed to Plaintiff, for the first time, that her mailing address had been recorded incorrectly in the Court's records, and advised her to file a written notice correcting the address. (Exhibit 6.)

27. On January 5, 2026 — before Plaintiff had received any court mail following the December 18 address correction — the Chief District Judge entered an Order accepting the Magistrate Judge's Findings and Recommendation and dismissed the First Action without prejudice.

### *C. Diligent pursuit and the ECF No. 11 refile signpost*

28. On or about January 12, 2026, Plaintiff received the Court's mailed correspondence and learned, for the first time, that the First Action had been dismissed. Plaintiff acted immediately: on January 21, 2026, she mailed a Motion to Reopen Case and Accept Payment of Filing Fee, tendering $405.00, together with a Notice of Correct Address.

29. Plaintiff's registration for the Court's electronic filing system was processed on January 22, 2026. On February 3, 2026, Plaintiff received an electronic filing alert and learned that the Court had declined to reopen the First Action, expressly noting that a plaintiff may file a second suit for claims dismissed without prejudice. See First Action, ECF No. 11. (Exhibits 7, 8.)

30. Plaintiff followed that signpost within nine days: on February 9, 2026, she mailed the Complaint commencing this action; the Court filed it on February 12, 2026, and Plaintiff paid the $405.00 filing fee a second time, for a total of $810.00 in filing fees paid out of pocket in pursuit of these claims. Defendant, which received, investigated, and responded to Plaintiff's EEOC charge and submitted a position statement addressing the factual allegations underlying the claims asserted here, suffered no prejudice from this timing.

## VI. FACTUAL ALLEGATIONS

### *A. Employment background, duties, and Novo's reliance on Plaintiff*

31. Plaintiff began working for Defendant in or about October 2021 as a contractor in the position of Customer Success Agent. In November 2022, Defendant hired Plaintiff as a

full-time direct employee and promoted her to Escalation Specialist. Plaintiff worked remotely from Tarrant County, Texas, throughout her engagement and employment with Defendant.

32. As of December 18, 2023, Plaintiff's internal role title was Escalation Specialist, Department CX, Job Level S4. (Exhibit 11.)

33. Plaintiff received positive performance feedback throughout her tenure, and management- and director-level leadership expressed satisfaction with her performance. Plaintiff was included in an internal Compliance email distribution group, alongside Compliance leadership, through which Compliance cases were routed to her, and she routinely handled compliance-related tickets and communications alongside designated Compliance staff.

34. Defendant designated Plaintiff its Subject Matter Expert ("SME") for the Checks vertical. A reference chart authored and owned by Plaintiff's team lead, Lia Mebane, directed Novo personnel to Plaintiff by name for checks-related issues, and Defendant's Q4 2023 Macro Project records likewise listed "Angel: Checks" among the project's designated SMEs.

35. Plaintiff handled work well beyond her Escalation Specialist duties, including completing the majority of Defendant's subpoena requests and Better Business Bureau complaint responses for much of 2023 and subsequently training Defendant's LegalOps team to assume those functions; training and coaching agents of Defendant's offshore support vendor, including conducting training sessions and grading agents' call performance; and serving as a resource for compliance-related matters for Novo personnel and employees of Defendant's partner bank. For this additional work, Plaintiff received a raise of $0.50 per hour.

36. On July 10, 2023, Mebane wrote to Lori Lawhorn of Defendant's Compliance function recommending Plaintiff for a Compliance role: *"Angel would be a phenomenal fit to your Team. She's fastidious, thorough and efficient. I can always count on her to complete tasks in a timely fashion"* and *"she comes highly recommended."* Lawhorn responded: *"I had already mentioned Angel to Edem previously, and just again too, so she is on his radar."* (Exhibit 30.)

37. On August 7, 2023, Senior BPO Manager Madeline Eckhart contacted Plaintiff directly to draw on Plaintiff's knowledge of how out-of-scope ticket types received from Defendant's partner bank should be triaged among Defendant's departments, in connection with a process-routing project Eckhart was working on with the partner bank.

38. On December 5, 2023, Plaintiff analyzed a customer matter involving a deceased account holder's estate and a closeout check, drafted the customer response, and submitted her analysis to Compliance Manager Daronn Grosvenor, who confirmed: *"Your response was correct."* Plaintiff regularly collaborated with Grosvenor on compliance matters, including identifying gaps in and helping improve Defendant's identity-theft processes.

39. On or about December 21, 2023, at the suggestion of Compliance Manager Daronn Grosvenor, Plaintiff communicated directly with Grant Sahag, Novo's Executive Vice President of Operations, and Tarcys Carlos, Novo's Manager of Legal and Regulatory Affairs, seeking guidance on a customer matter involving identity theft, a demand letter, a report to the Federal Trade Commission, a police report, and a regulatory complaint against Novo. Mr. Carlos engaged Plaintiff substantively on the matter and undertook to investigate further and respond to her.

40. On December 19, 2023, a colleague, Krystal Velasco, wrote to Plaintiff: *"Hi Angel, I wanted to let you know I used your stop payments for checks as example of work done to Grant and it was great!"* Plaintiff's work product was thus presented to Novo's Executive Vice President of Operations as an exemplar of quality work in the weeks immediately preceding her demotion. (Exhibit 31.)

41. At the end of Q3 2023, at Defendant's direction, Plaintiff completed an Employee Performance Review Self-Assessment as part of a process Defendant described as ensuring that employees' compensation aligned with their performance and, as communicated to Plaintiff's team, mapping out promotion; Plaintiff's team lead was to complete a corresponding review for each team member. In her self-assessment, Plaintiff catalogued for Defendant the additional functions described above. Less than four months later, without intervening discipline, Defendant demoted Plaintiff.

42. On January 18, 2024, Mebane provided Plaintiff Defendant's quality assurance ("QA") scores covering April 14 through December 31, 2023: Plaintiff scored 95.73%, above the company average of 92.12%, with zero audited interactions scoring below 90. When Plaintiff asked in the same exchange about the lower customer-satisfaction ("CSAT") figures associated with escalation work, Mebane answered in writing: *"Essentially, you're correct CSAT is dependant on multiple factors product, rejections etc."* (Exhibit 15.)

***B. Disability and disclosure***

43. Plaintiff has a disability within the meaning of the ADA, including a traumatic brain injury and chronic migraines, which substantially limit major life activities including concentrating, thinking, sleeping, and working during flare-ups. Plaintiff's migraines are further an episodic impairment that substantially limits a major life activity when active,

within the meaning of Texas Labor Code § 21.0021(a)(2), and affect major life activities including concentrating, thinking, sleeping, and working, within the meaning of Texas Labor Code § 21.002(11-a).

44. In or about summer 2022, during Plaintiff's engagement with Defendant, Plaintiff disclosed her chronic migraines to her then-team lead, Dante. Dante was aware of Plaintiff's flare-up-related absences. Plaintiff's then-team lead told Plaintiff that Human Resources was aware as well.

45. Lia Mebane later became Plaintiff's team lead. Beginning no later than January 18, 2024, HR Generalist Janet Hefferan had written notice of Plaintiff's pursuit of mental-health treatment, as described below, and beginning no later than February 2024, Hefferan was aware of Plaintiff's disability and medical absences, as reflected in Hefferan's own written communications described below.

***C. The January 17, 2024 "merger," demotion, and severance ultimatum***

46. On Wednesday, January 17, 2024, at 11:54 AM, Rylee Gulde, Novo's Quality Assurance Manager, emailed Plaintiff and three of Plaintiff's colleagues — Carrington Miller, Kiara Fuertes, and Janis Escobar — with a copy to Lia Mebane, Madeline Eckhart, and Grant Sahag, under the subject line "Customer Support and Success Merger." (Exhibit 10.)

47. Gulde's email announced that the merger was effective January 22, 2024, unifying Plaintiff's team into an "Onshore Success" team under team leads Lia Mebane and Chanelle, reporting to Madeline Eckhart. The email offered a severance package of one month of severance pay and one month of COBRA healthcare to *"[e]scalation agents who may prefer not to continue as support agents,"* with a decision required by Wednesday,

January 24, 2024, and a final working day of Friday, January 26, 2024, for those who elected it.

48. Gulde's email set new productivity benchmarks and stated that *"[f]ailure to meet the expectations outlined below for three consecutive weeks will result in the initiation of a performance improvement plan."* It further imposed a new attendance policy: *"Failure to notify your TL for an unexpected absence will result in 1 verbal warning. Subsequent occurrences will lead to a performance improvement plan. Abuse of the sick leave policy will result in a conversation with HR and a subsequent performance improvement plan."* (Exhibit 10.)

49. On or about mid-January 2024 (approximately January 17, 2024), consistent with Gulde's email, Defendant reduced Plaintiff's internal job level from S4 to S3, without prior formal discipline consistent with such a reduction and without placing Plaintiff on a performance improvement plan. As of January 31, 2024, Plaintiff's internal role title was recorded as "Onshore Customer Support Specialist," Department CS, Job Level S3, with a target start date of February 2024 and Madeline Eckhart listed as hiring manager. (Exhibit 12.)

50. Within minutes of Gulde's email, in a team Slack thread, Plaintiff's colleague Kiara Fuertes asked whether the email meant the team would be taking phone calls again and observed, *"this feels like a demotion."* Plaintiff's own team lead, Lia Mebane, responded in that same thread: *"it certainly does to me as well."* (Exhibit 13.)

51. That same day, January 17, 2024, Mebane wrote to Plaintiff and her teammates in a group text message that she had *"documented with HR hostile work environment and fear of retaliation already,"* explaining: *"Meaning that I've already documented your grievances before the email came out."* Defendant's Human Resources function thus had

documentation of the team's hostile-work-environment and retaliation concerns, reported by Plaintiff's own supervisor, before the January 17 email issued.

52. On January 18, 2024, the day after the Gulde email, Plaintiff and her teammates attended a video meeting of approximately one hour with HR Generalist Janet Hefferan and Patrick ("Pat") Hedges of Defendant's People Ops team, during which Plaintiff raised her grievances regarding the January 17 changes. Plaintiff thereafter emailed a written recap of the points and grievances she had raised to Human Resources.

53. Plaintiff's January 18, 2024 written recap disclosed to Human Resources that Plaintiff was *"recently pursuing mental health assistance to help cope with the extreme stress I have been trying to manage for months now"*; stated *"I fear retaliation"* and recounted that the team had been told that if they *"complained and did not like our additional duties, we would be put back on tickets full-time after the new year"*; described the January 17 changes as targeted and as *"a punishment in retaliation for pointing out the lack of effective direction/management"*; and recorded that Plaintiff had been tapped for a move to Compliance and told the move had not yet occurred due to *"restructuring the department/the department not having the budget for a new member at the time."* (Exhibit 14.)

***D. Defendant's own trainer pre-authorized the conduct later punished as a "Final Warning"***

54. On or about the morning of January 30, 2024, members of Plaintiff's team — including Plaintiff, Carrington Miller, Kiara Fuertes, and Janis Escobar — attended a phones refresher training conducted by Robbi Blackwell, the same Novo manager identified in Gulde's January 17 email in connection with the new reporting structure. Blackwell announced that the team would begin taking calls the following day.

55. During that training, team members raised that their headsets, required for taking customer calls, had not yet arrived; Mebane had informed the team the prior week that new headsets had been ordered for them. Blackwell instructed the team that, in that circumstance, they should begin taking calls as soon as they received their headsets and keep their team lead informed.

56. Defendant's own trainer thus pre-authorized, in advance and to the team as a group, precisely the conduct — delaying calls until headset delivery — for which Defendant would discipline Plaintiff two days later.

***E. Plaintiff's January 30 written protest and Eckhart's response***

57. On the afternoon of January 30, 2024, following a team meeting in which Plaintiff and colleagues raised concerns about the January 17 changes, Eckhart messaged Plaintiff and colleagues: *"I felt a bit blindsided in that meeting - what was the miscommunication?"* Plaintiff responded that *"our entire team has felt blindsided"* by the changes and proposed an open discussion. (Exhibit 16.)

58. Eckhart replied, in relevant part: *"Im a bit disappointed in how this was raised earlier in the meeting - raising questions or concerns is welcomed, as open communication is important, but continuing to push back to your supervisor on a teamwide call is not constructive nor is it very respectful."*

59. At 4:55 PM on January 30, 2024, Plaintiff wrote to Eckhart, in relevant part: *"Trying to force our team to take a clear demotion is counterproductive and beyond disrespectful after the loyalty and dedication we've poured into Novo,"* and: *"This continues to feel very hostile and targeted to the members of the ES Team."* Eckhart followed up the next day, January 31, 2024, asking the team to share an agenda of its concerns. (Exhibit 16.)

***F. February 1, 2024: the first scheduled call day, Plaintiff's illness, and the same-day "Final Warning"***

60. February 1, 2024, was the first day Plaintiff was scheduled to take customer phone calls under the new structure announced in Gulde's January 17 email.

61. At 8:14 AM on February 1, 2024, Plaintiff messaged team lead Chanelle over Slack: *"Hi Chanelle. No disrespect to you at all but I won't be on the phone. I don't even have a headset yet by the way."* At 8:43 AM, Plaintiff messaged Chanelle again: *"Hey, I'm calling off as my migraine spiked and I just threw up. I'll have a medical note when I return."* At 8:54 AM, Chanelle responded: *"Hi, thank you for letting me know && I'm very sorry to hear that - take care of yourself!"* (Exhibit 17.)

62. At 4:51 PM that same day — approximately eight hours after Plaintiff's documented, acknowledged sick-day notice, and approximately 48 hours after Plaintiff's January 30 written protest — Eckhart emailed Plaintiff, with a copy to Novo's People Ops team and Mebane, an email bearing the subject line "Final Warning." The email cited *"unsatisfactory performance in fulfilling core job responsibilities as outlined in your job description and email sent out on January 17th"* and stated: *"[t]his morning you informed the Team Lead over Slack that you would not be on the phone today as assigned."* Regarding the headset, Eckhart's own email stated: *"it was scheduled to arrive today but encountered issues delivering to your address, so Janet will be reaching out to assist."* The email invited Plaintiff to discuss any obstacles with her lead or HR, stating "*We are here to support you,"* and concluded: *"This is your final warning and continued refusal to take customer phone calls as assigned will result in further disciplinary action up to and*

*including termination. This warning will be placed in your personnel file, please acknowledge your receipt of this email."* (Exhibit 18.)

63. Eckhart's Final Warning was Plaintiff's first-ever formal discipline in her tenure with Defendant. It was styled as a "final" warning with no intervening lesser warning and without the performance improvement plan process Gulde's January 17 email had announced; it was issued the same day as — and hours into — a Slack-documented illness that Chanelle had already acknowledged with well-wishes; and by its own terms it conceded that the headset Plaintiff needed to take calls had not been successfully delivered to her.

64. Defendant's own internal quality records for the week of January 29 through February 4, 2024 — the week of the Final Warning — recorded Plaintiff's QA score as 100%. (Exhibit 25.)

65. Also on February 1, 2024, at 2:32 PM, Hefferan messaged Plaintiff directly to confirm Plaintiff's shipping address for a headset Defendant had shipped via Amazon. (Exhibit 21.)

***G. February 2–8, 2024: Defendant's own contemporaneous records contradict its later "no call/no show" narrative***

66. On Friday, February 2, 2024, at 4:49 PM, Hefferan emailed Plaintiff: *"I understand that you called out sick yesterday but we are concerned that you did not sign on today and no one has heard from you."* Hefferan's own email thus acknowledged Plaintiff's February 1 notice of illness. (Exhibit 19.)

67. On Monday, February 5, 2024, at 12:57 AM, Plaintiff replied to Hefferan: *"Hi Janet, I've been pretty ill since Thursday and still not doing well. I [have] a medical note for Thurs/Fri*

*and will be seen again tomorrow I'm not any better. I'll reach out to speak to you in the next couple days when I'm better able speak on a call.”* (Exhibit 19.)

68. Plaintiff was absent from work due to illness on approximately February 1–2 and February 5–7, 2024, presenting a combination of her usual severe migraine symptoms — severe headache and dizziness — together with acute illness including vomiting and fever.

69. Plaintiff obtained two physician's notes covering these absences: one from Teladoc, dated February 2, 2024, excusing Plaintiff from work for three days; and one from CallonDoc, dated February 7, 2024, stating that Plaintiff was under a provider's care beginning February 5, 2024, covering February 5 through 7, 2024, and clearing Plaintiff to return February 8, 2024. Neither note states a diagnosis. (Exhibits 22, 23.)

70. On Thursday, February 8, 2024, at 6:44 AM, Hefferan emailed Plaintiff an email bearing the subject line “[Response Requested] No Call, No Show Absences.” Hefferan's email asserted that Plaintiff had been absent February 1, 2, 5, 6, and 7, 2024; that Plaintiff was a *“'no call, no show'”* on February 2, 6, and 7; that Hefferan had called, left a voicemail, and emailed Plaintiff on February 2 with no response until February 5; that Chanelle had contacted Plaintiff by Slack on February 2 and 5 with no response; and that Mebane had reached out by email on February 6 with no response. Hefferan's email advised Plaintiff that she might be eligible for leave, including short-term disability through Defendant's MetLife policy, and demanded a return to work or documentation by 9:00 AM Eastern on February 9, 2024, warning that Defendant would otherwise *“consider you to have abandoned your position and may terminate your employment accordingly.”* (Exhibit 20.)

71. Hefferan's February 8 designation of February 2 as a “no call, no show” is directly contradicted by Hefferan's own February 2 email, in which Hefferan herself acknowledged

Plaintiff's notice of illness, and Hefferan's assertion that Chanelle's outreach went unanswered is contradicted by the February 1 Slack exchange in which Chanelle acknowledged Plaintiff's written Slack notice of illness with well wishes. (Exhibits 17, 19, 20.)

72. On February 8, 2024, at 7:59 AM — more than a full day before Hefferan's 9:00 AM February 9 deadline — Plaintiff emailed both medical notes to Hefferan, writing "Here are my notes."

73. That same morning, at 7:44 AM, Plaintiff had responded to Chanelle over Slack: *"Sorry I missed this, I wasn't on my computer at all. I sent Janet a email over the weekend and Lia checked on me on Monday. I will be on shortly to start my shift. I received my headset on Saturday and I'll turn in my notes to HR."* At 8:18 AM, Plaintiff messaged Hefferan directly regarding the headset: *"I have the headset, I didn't get it until Saturday. There was some confusion and it ended up in the leasing office."* At 8:23 AM, Hefferan responded: *"I am glad to hear about the headset, Amazon marked it as undeliverable so I wasn't sure if you'd gotten it at all."* (Exhibits 17, 21.)

74. Defendant's own contemporaneous HR record thus establishes that the headset Plaintiff needed to take calls was not successfully delivered until Saturday, February 3, 2024 — two days after Plaintiff's first scheduled call day and after Defendant had already issued Plaintiff a "Final Warning" partly premised on Plaintiff's failure to take calls. (Exhibit 21.)

75. In responding to Plaintiff's EEOC Charge, Defendant took the position that headsets were not required for Plaintiff's role and that Plaintiff's claims regarding headset delays were unfounded. That position is inconsistent with Defendant's own contemporaneous internal communications described above, in which Defendant's own manager and HR Generalist

discussed obtaining, shipping, and confirming delivery of a headset for Plaintiff and referenced headset issues directly in connection with Plaintiff's performance discipline.

76. Despite Plaintiff's timely notice and timely delivery of both medical notes, Defendant's internal metrics records — maintained by Defendant's management — marked Plaintiff's February 1, 2, 5, 6, and 7 absences with “U” for “Unexcused” on the workbook's attendance tab, while the same workbook's daily tab recorded February 2 and February 5 through 7 as “OOO,” out of office. Defendant never corrected the “unexcused” designations or the discipline premised on them. (Exhibit 25.)

***H. The point system, accommodation requests, and Defendant's failure to engage***

77. During Plaintiff's employment, Defendant maintained and communicated an “unlimited PTO” policy and instructed employees not to work while ill.

78. After Plaintiff's disability disclosures and medically necessary absences described above, Defendant began treating the unlimited PTO policy as no longer applicable to Plaintiff and subjected her to increased scrutiny and discipline tied to her disability-related absences.

79. On or about February 15, 2024, Eckhart authored and distributed a standup document announcing an *“Adjusted Point System”* under which *“Absence = 1 point,”* tardiness or leaving early by more than one hour accrued one-half point, and tardiness or leaving early by less than one hour accrued one-quarter point. On its face, the system contained no exception for medically documented or disability-related absences. (Exhibit 24.)

80. On or about February 23, 2024, Plaintiff emailed Hefferan asking about the purpose of “reasonable accommodation paperwork” Hefferan had referenced, noting that Plaintiff had already printed accommodation paperwork from Novo's benefits portal and intended to bring it to a therapy appointment that day. Plaintiff followed up over Slack on February 28

and February 29, 2024, after receiving no meaningful response, writing on February 29: "I do not understand and I am seeking clarity."

81. Defendant's responses to Plaintiff's accommodation requests were delayed and incomplete, including admissions by Defendant's own personnel of internal communication failures such as forgetting to send messages Plaintiff was awaiting. Defendant failed to engage in a good-faith interactive process to identify and implement reasonable accommodations for Plaintiff's disability, and instead responded with escalating scrutiny and discipline.

82. On February 23, 2024, Plaintiff asked Mebane to approve paid time off for Friday, March 1, 2024, for a time-sensitive residential move, providing the one week's advance notice Defendant required. Although Defendant maintained an unlimited PTO policy, Mebane responded that she could not approve the request because Plaintiff already had approved paid time off scheduled for the following week, stating *"I cannot approve everyone,"* and presented Plaintiff with two options: submit supporting documentation to Human Resources, or, in Mebane's words, *"Call out and it will count against you."* Plaintiff submitted the documentation to Human Resources and followed up in writing on February 28, 2024; Defendant did not communicate approval until the evening of February 29, 2024 — the day before the scheduled absence — when Hefferan wrote that she had approved the PTO, acknowledging of her own approval notice: *"^message I never hit send on."* Defendant did not impose documentation conditions of this kind on other employees using paid time off under its unlimited PTO policy.

83. On February 27, 2024, Mebane wrote to Plaintiff's team in its group channel, addressing the team as *"Veterans,"* asking them to *"step it up"* and use their "critical thinking skills," and requesting that they assist with additional coverage over the following week: *"I am asking*

*this personally....for me."* Plaintiff responded: *"No problem. Let us know whatever else you need help with."* The following morning, a teammate directed an identity-verification question in the group channel to Plaintiff by name.

***I. Hostile statements reflecting disability bias***

84. During approximately January through early March 2024, HR and supervisory personnel, including Janet Hefferan and Lia Mebane, made statements to Plaintiff including: *"it seems you are not able to do this job"*; *"your performance is declining"*; and *"what makes you think your job is supposed to pay you just because you're sick. Nobody cares!"*

85. These statements were made to Plaintiff while she was disclosing and documenting a disability and engaging in protected activity, and were accompanied by escalating discipline and scrutiny of the kind described above.

***J. March 2024: support refused, benchmarks reduced within days of Plaintiff's leave, discipline never revisited***

86. On March 4, 2024, Plaintiff attended a one-on-one meeting with Mebane, recorded in Defendant's Small Improvements system. Mebane's action item for Plaintiff thanked her *"for taking initiative"* on the integrations and knowledge-capture projects. Mebane's meeting notes simultaneously stated: *"You're accountable for your productivity and not meeting metrics,"* and: *"We will not provide additional training and resources at this time for individual Agents that are not meeting metrics."* (Exhibit 26.)

87. Defendant thus refused Plaintiff the very support its February 1 Final Warning had invited her to seek, while never placing Plaintiff on the performance improvement plan its own January 17 email had announced as the process for metrics shortfalls. Defendant's stated

progressive process was announced, promised, and then skipped in Plaintiff's case in favor of a “final” warning and termination threats.

88. Plaintiff's last day of work for Defendant was on or about March 5, 2024. On or about that day, Plaintiff met with Hefferan to confirm that she had completed the documentation Defendant required for her leave, to understand how the leave and benefits process worked, and to inform Hefferan that she would not be returning to work. Hefferan told Plaintiff that if Defendant's insurer, MetLife, did not approve Plaintiff's benefits, Plaintiff would have to return to work or be terminated.

89. On March 8, 2024, at 3:21 PM, in the team's group channel, with a copy to Mebane and Eckhart, Chanelle posted an announcement titled “Weekend Shift Expectations,” stating there was *“a concerning trend of productivity scores falling below our benchmarks on weekends”* and reducing the required number of comments per hour from ten to seven team-wide. (Exhibit 28.)

90. Defendant's team-wide benchmark reduction, issued within days of the start of Plaintiff's leave, reflected Defendant's own admission that the productivity standards it had used to discipline Plaintiff weeks earlier were not being met workforce-wide. Defendant never retracted, corrected, or reconsidered the discipline it had imposed on Plaintiff under those same standards.

***K. Plaintiff's leave, MetLife's independent determination, and Defendant's September 2024 request that Plaintiff return***

91. On the recommendation of her treating therapist, who advised a six-month medical leave from March 1 to September 1, 2024, Plaintiff filed her claim for short-term disability benefits with Defendant's insurance carrier, MetLife, on March 6, 2024. MetLife approved

Plaintiff's short-term and, later, long-term disability benefits through its own independent medical assessment process; Defendant did not approve those benefits and was not a party to MetLife's determination. (Exhibit 27.)

92. On May 13, 2024, at 2:13 PM, Hefferan emailed Plaintiff, copying Plaintiff's Novo email address, writing that she was *"reaching out to check in about a return to work date for you,"* that Plaintiff's *"Short Term Disability claim is certified through May 17, 2024,"* and proposing a return date of May 20, 2024. Hefferan added: *"As we previously discussed, we want to schedule refresher training and training on new products and procedures to set you up for a successful return."* (Exhibit 29.)

93. In or about September 2024, at or around the return date her therapist had originally identified, Hefferan, and on information and belief Eckhart, contacted Plaintiff regarding the status of her short-term disability leave and communicated a date by which Defendant expected Plaintiff to return to work.

94. By repeatedly communicating expected return-to-work dates to Plaintiff and planning for her return — in writing in May 2024, and again in or about September 2024 — Defendant treated Plaintiff as an employee who was expected to, and capable of, returning to her position, undermining any later contention that Plaintiff was not a qualified individual capable of returning to work while on leave.

***L. November 15, 2024: termination while on approved leave***

95. Despite Plaintiff's ongoing, Defendant-recognized, MetLife-approved disability leave, on November 15, 2024, Defendant terminated Plaintiff's employment without prior warning, without placing Plaintiff on a performance improvement plan, and without offering any alternative accommodation or return-to-work plan.

96. At 12:14 PM on November 15, 2024, Plaintiff photographed the lock screens of her Novo-issued MacBook and Chromebook. The MacBook displayed a message stating the system had been locked by Plaintiff's organization and required a system PIN. The Chromebook displayed a message stating the device had been reported missing or stolen and had been disabled for security reasons. Plaintiff had not reported either device missing or stolen. (Exhibit 32.)

97. At 12:34 PM on November 15, 2024, Hefferan, via DocuSign, transmitted to Plaintiff a severance agreement and a Confidential Information and Invention Assignment Agreement for Plaintiff's signature, writing: *"Hi Angel, please find your separation agreement included here. Please review and sign at your earliest convenience."* (Exhibit 33.)

98. At 12:49 PM on November 15, 2024, Patrick Hedges of Defendant's People Ops team, copying Hefferan, emailed Plaintiff: *"This email is to inform you that on November 15th, Novo conducted a reduction in force and your role was impacted. Today will be your last day at Novo."* The email acknowledged: *"We understand that you are currently on leave."* It further stated: *"Your access to your Novo email and company systems will be rescinded momentarily. At that point, you will not be able to access any Novo-related systems or information."* (Exhibit 34.)

99. Defendant thus locked Plaintiff out of its systems and devices at least 35 minutes before it informed her of her termination, and transmitted severance papers for her signature 15 minutes before the termination notice itself. Hedges's statement that Plaintiff's access "will be rescinded momentarily" was sent after that access had already been cut, as Defendant's own device lock screens, photographed at 12:14 PM, reflect. (Exhibits 32, 33, 34.)

100. Defendant's same-day lockout of Plaintiff's devices and systems prevented Plaintiff from accessing work records relevant to her accommodation requests, communications, and performance — records that remain in Defendant's possession, custody, and control.

***M. Post-termination conduct and the Compliance role***

101. Before Plaintiff's leave, Novo personnel repeatedly told Plaintiff that her contemplated move into a Compliance role — for which Compliance personnel and Plaintiff's own supervisor had expressed support in writing — awaited budget approval, an explanation Plaintiff recorded in her January 18, 2024 written recap to Human Resources. On information and belief, during Plaintiff's disability leave, Novo hired a new employee into a Compliance role of the kind Plaintiff had been promised.

102. Following her termination, Defendant presented Plaintiff with a severance offer of approximately $3,060.00 (before taxes), conditioned on Plaintiff's waiver of claims, including her pending EEOC charge. Defendant thereafter sent Plaintiff repeated DocuSign signature requests for the severance agreement, approximately every other day, for approximately four months, from November 17, 2024 through at least mid-March 2025. Plaintiff did not sign the agreement.

103. Defendant demanded return of Plaintiff's company equipment, while permitting other separated employees, including a former teammate, Carrington Miller, who was terminated after Plaintiff, to retain his equipment.

104. Defendant's actions caused Plaintiff economic harm, including lost wages and benefits — including the loss of Plaintiff's employer-provided medical, dental, and vision coverage effective November 30, 2024, while Plaintiff remained on disability leave — and caused Plaintiff significant emotional distress and exacerbation of her medical conditions,

including increased stress, worsening migraines, and worsening anxiety and depression symptoms, requiring medical and therapeutic care and impairing Plaintiff's ability to function and work.

## VII. CAUSES OF ACTION

### *COUNT I — ADA DISABILITY DISCRIMINATION (42 U.S.C. § 12112)*

105. Plaintiff realleges and incorporates by reference Paragraphs 1 through 104 above.

106. Plaintiff has a disability within the meaning of the ADA, 42 U.S.C. § 12102, and Defendant knew of Plaintiff's disability at all times relevant to the conduct alleged herein.

107. Plaintiff was a qualified individual capable of performing the essential functions of her position, with or without reasonable accommodation, as demonstrated by her performance history and Defendant's own documented reliance on her described above — including her above-average QA scores, her SME designations, her supervisor's written recommendation of her as "phenomenal," and Defendant's executive, legal, and compliance personnel drawing on her work — and by Defendant's own conduct, including its September 2024 communication of an expected return-to-work date.

108. Defendant subjected Plaintiff to adverse employment actions because of her disability, including the January 2024 demotion, the February 1, 2024 Final Warning, the written "no call/no show" discipline, and Plaintiff's termination on November 15, 2024, while she was on approved disability leave.

109. Defendant's stated reasons for these adverse actions are undermined by Defendant's own contemporaneous records: Eckhart's Final Warning concedes the headset delivery failure it also cites as a basis for discipline; Hefferan's February 8, 2024 "no call/no show" narrative is contradicted by Hefferan's own February 2, 2024 email; Defendant's internal records

scored Plaintiff's QA at 100% for the very week of the Final Warning; Defendant's own attendance workbook recorded the same February days as both “Unexcused” and “OOO”; and the productivity benchmarks underlying Plaintiff's discipline were reduced team-wide within days of the start of Plaintiff's leave, without any corresponding reconsideration of the discipline already imposed on Plaintiff.

110. As a direct and proximate result of Defendant's discrimination, Plaintiff has suffered and continues to suffer lost wages and benefits, emotional distress, and other damages, in an amount to be proven at trial.

***COUNT II — ADA FAILURE TO ACCOMMODATE (42 U.S.C. § 12112(b)(5)(A))***

111. Plaintiff realleges and incorporates by reference Paragraphs 1 through 104 above.

112. Plaintiff had a known disability and requested reasonable accommodations from Defendant, including flexibility for medically necessary absences related to her disability and completion of accommodation paperwork, as described above.

113. Defendant failed to engage in a good-faith interactive process with Plaintiff to identify and implement reasonable accommodations, instead responding to Plaintiff's requests with delay, incomplete communication — including an approval notice its HR Generalist acknowledged in writing she “never hit send on” — and escalating discipline, including an attendance point system that on its face penalized every absence identically, with no exception for medically documented or disability-related absences.

114. Defendant's failure to accommodate Plaintiff was not justified by any undue hardship, and reasonable accommodations were available to Defendant that would not have imposed such a hardship.

115. As a direct and proximate result of Defendant's failure to accommodate, Plaintiff has suffered and continues to suffer lost wages and benefits, emotional distress, and other damages, in an amount to be proven at trial.

***COUNT III — ADA RETALIATION (42 U.S.C. § 12203)***

116. Plaintiff realleges and incorporates by reference Paragraphs 1 through 104 above.

117. Plaintiff engaged in activity protected under the ADA, including disclosing her disability and her pursuit of mental-health treatment — including in her January 18, 2024 written recap to Human Resources — requesting reasonable accommodations, providing medical documentation for disability-related absences, and filing her EEOC Charge on July 23, 2024.

118. Defendant subjected Plaintiff to materially adverse actions following and because of this protected activity, including the February 1, 2024 Final Warning issued approximately 48 hours after Plaintiff's January 30 written protest and hours into a documented sick day; the February 8, 2024 "no call/no show" discipline built on a narrative contradicted by Defendant's own records; and Plaintiff's termination on November 15, 2024, during the same disability leave that Plaintiff's sworn EEOC Charge had identified as the period in which she feared retaliation.

119. The temporal proximity between Plaintiff's protected activity and Defendant's adverse actions, Defendant's documented notice of the team's retaliation fears — reported to Human Resources by Plaintiff's own supervisor before the January 17 email and recorded in Plaintiff's own January 18 written recap — and the inconsistencies in Defendant's stated reasons described above, together support a causal connection between Plaintiff's protected activity and Defendant's adverse actions.

120. As a direct and proximate result of Defendant's retaliation, Plaintiff has suffered and continues to suffer lost wages and benefits, emotional distress, and other damages, in an amount to be proven at trial.

***COUNT IV — TEXAS LABOR CODE CHAPTER 21 (§§ 21.051, 21.055, 21.128)***

121. Plaintiff realleges and incorporates by reference Paragraphs 1 through 104 above.

122. Under Texas Labor Code § 21.051, Defendant discriminated against Plaintiff because of her disability with respect to the terms, conditions, and privileges of her employment, including through the conduct described above.

123. Under Texas Labor Code § 21.055, Defendant retaliated against Plaintiff for engaging in activity protected under Chapter 21, including opposing discriminatory practices and requesting accommodation, through the conduct described above.

124. Under Texas Labor Code § 21.128, Defendant failed to make reasonable workplace accommodations for Plaintiff's known physical impairment, through the conduct described above.

125. Plaintiff pleads these claims subject to the timeliness and exhaustion framework set forth in Parts IV and V above. Plaintiff does not assert any discrete act occurring before January 25, 2024 as a stand-alone state-law claim; such conduct is pleaded solely as background evidence and as part of the continuing violation supporting Plaintiff's timely federal and state claims.

126. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer lost wages and benefits, emotional distress, and other damages, in an amount to be proven at trial.

***COUNT V — DISABILITY-BASED HOSTILE WORK ENVIRONMENT***

127. Plaintiff realleges and incorporates by reference Paragraphs 1 through 104 above.

128. Plaintiff was subjected to unwelcome conduct based on her disability, including the hostile statements described above, the same-day "Final Warning" issued hours into a documented sick day, the written "no call/no show" narrative that Defendant's own contemporaneous records contradict, and the refusal of support and resources documented in Defendant's own March 4, 2024 meeting notes.

129. This conduct was sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and create an abusive working environment, as reflected in the frequency and escalating nature of the discipline and statements directed at Plaintiff over the January through November 2024 period described above.

130. Defendant knew or should have known of this conduct: hostile-work-environment concerns were documented with Human Resources by Plaintiff's own supervisor before January 17, 2024, and by Plaintiff herself in her January 18, 2024 written recap and her January 30, 2024 written protest, and the conduct was carried out by Plaintiff's own supervisors and Human Resources personnel. Defendant's own written Code of Conduct provided that employees who report a concern in good faith "cannot be subjected to any adverse employment action" including "[u]nfair dismissal, demotion or suspension," and defined bullying to include "[u]nfairly denying training, leave or promotion." Defendant failed to take prompt and effective corrective action.

131. As a direct and proximate result of this hostile work environment, Plaintiff has suffered and continues to suffer emotional distress and other damages, in an amount to be proven at trial.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant, and award Plaintiff:

a. Compensatory damages, including but not limited to lost wages, lost benefits, and emotional distress damages, in an amount to be proven at trial;

b. Punitive damages to the extent available under the ADA and Texas Labor Code Chapter 21;

c. Equitable relief, including reinstatement or front pay in lieu thereof, and any other equitable relief the Court deems just and proper;

d. Pre-judgment and post-judgment interest as allowed by law;

e. Costs of suit, including the $810.00 in filing fees Plaintiff has paid in pursuit of these claims; and

f. Such other and further relief as the Court deems just and proper.

**IX. JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

**X. VERIFICATION**

I, Angella Everett, declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that I have read the foregoing First Amended Complaint, and that the factual allegations contained herein are true and correct to the best of my knowledge, information, and belief.

Executed on this 6th day of August, 2026.

Respectfully submitted,

By: Angella Everett

Angella Everett

Appearing in Propria Persona
1209 N. Saginaw Blvd., Ste. G #145
Saginaw, Texas 76179
Telephone: 817-458-8353
Email: aevere04@gmail.com

**CERTIFICATE OF SERVICE**

I certify that on August 6, 2026, I electronically filed the foregoing First Amended Complaint with the Clerk of Court using the CM/ECF system, which will serve notice on all counsel of record, including counsel for Defendant Novo Platform Inc.

By: Angella Everett
Angella Everett

## EXHIBIT INDEX

1. EEOC Charge of Discrimination No. 520-2024-02399 (year-of-birth only)
2. EEOC Determination and Notice of Rights (issued 08/18/2025)
3. EEOC transmittal email, August 18, 2025, 4:26 PM
4. USPS postage receipt and certified mail receipt, November 17, 2025
5. Signed USPS return receipt card (received November 19, 2025)
6. Clerk's Office telephone call log, December 18, 2025
7. CM/ECF registration confirmation (processed January 22, 2026)
8. First Action ECF No. 11 (Order declining to reopen)
9. TWC Employment Intake Supervisor Alex Stewart email confirmation
10. Rylee Gulde email, January 17, 2024 (“Customer Support and Success Merger”)
11. Job description screenshot, Job Level S4, December 18, 2023
12. Job description screenshot, Job Level S3, January 31, 2024
13. January 17, 2024 team Slack thread (Mebane “demotion” statement)
14. Plaintiff's January 18, 2024 Round Table written recap to Human Resources
15. January 18, 2024 QA scores exchange (April 14 – December 31, 2023 KPI table)
16. January 30–31, 2024 Slack thread with Madeline Eckhart
17. February 1–8, 2024 Chanelle Slack thread
18. Eckhart “Final Warning” email, February 1, 2024
19. Hefferan email, February 2, 2024, and Plaintiff's February 5, 2024 reply
20. Hefferan “[Response Requested] No Call, No Show Absences” email, February 8, 2024
21. Headset Slack messages (Hefferan direct message) [PII: prior address and phone number redacted]
22. Teladoc physician's note, February 2, 2024 [PII: prior address redacted]
23. CallonDoc physician's note, February 7, 2024 [PII: date of birth redacted]
24. “Onshore Standup 2.15” document (Adjusted Point System), February 15, 2024
25. Defendant's internal metrics workbook screenshots (attendance and daily tabs; weekly QA)
26. March 4, 2024 Small Improvements one-on-one record
27. MetLife short-term disability claim confirmation, March 6, 2024
28. March 8, 2024 team-wide metrics reduction announcement
29. Hefferan return-to-work email, May 13, 2024
30. July 10, 2023 Mebane–Lawhorn Slack exchange
31. December 19, 2023 Krystal Velasco Slack message
32. Lockout photographs, MacBook and Chromebook, November 15, 2024
33. Hefferan DocuSign severance transmission email, November 15, 2024, 12:34 PM
34. Hedges termination email (“Novo Transition & Next Steps”), November 15, 2024, 12:49 PM

**NOTE ON PII REDACTION (for assembly, not part of the pleaded allegations):** Exhibits 21, 22, and 23 are filed in redacted form: Exhibit 21 with Plaintiff's prior residential address and prior telephone number redacted; Exhibit 22 with Plaintiff's prior residential address redacted; and Exhibit 23 with Plaintiff's date of birth redacted. All exhibit pages must be rescanned for FRCP 5.2(a) restricted identifiers before assembly and filing.

# EXHIBIT 1

EEOC Charge of Discrimination No. 520-2024-02399

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | EEOC<br>FEPA | 520-2024-02399 |

**Texas Workforce Commission Civil Rights Division** and EEOC

*State or local Agency, if any*

| I Name *(indicate Mr., Ms., Mrs., Miss, Mx., Dr., Hon., Rev.)* | Home Phone | Year of Birth |
|---|---|---|
| Angella Everett | (917) 495-2490 | 1982 |

Street Address

P.O. Box 12108

AUSTIN, TX 78711

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (*If more than two, list under PARTICULARS below.*)

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| Novo Platform Inc. | 101 - 200 Employees | (844) 260-6800 |

Street Address

222 Broadway Fl. 20

NEW YORK, NY 10038

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| | | |

Street Address City, State and ZIP Code

| DISCRIMINATION BASED ON | DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|---|
| | Earliest | Latest |
| Age, Disability, Race | 11/01/2022 | 06/27/2024 |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I (Hispanic/Pacific Islander, 42) began working for the above Respondent eventually becoming an Escalation Specialist and Subject Matter Expert under the supervision of Customer Success Supervisor Lia Mebane (Hispanic) and her boss, Manager Madeline Eckhart (White). During my employment, I was given more responsibilities without a pay increase. I was a part of a team of four and we were all Hispanic. Lia would make comments towards us and referred to us as "you people" and "people like you." I was regularly told that I was going to get promoted and join the compliance department and Lia often referred to me/directed others to me for assistance as the "Compliance liaison". I was even added to group emails that included me as part of the Compliance team as I regularly performed Compliance duties. My three other team members were promised moves to different departments, which never came to fruition for them either. In early summer of 2023, I was tapped for a move to the Compliance team by Lori Lawhorn. When I followed up with her a short time later, she expressed that upper management was not going to support the move at that time as they would not approve my salary increase to make that move. I was told off the record that they were really only looking to hire Indian employees so they could pay them less. I continued to to work closely with the Compliance team and regularly expressed my interest in moving to that team. It was common knowledge amongst my team, my lead and higher management, and adjacent teams that I would be moving over to

| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
| I declare under penalty of perjury that the above is true and correct.<br><br>**Digitally Signed By: Angella Everett**<br>**07/23/2024**<br><br>*Charging Party Signature* | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |



**EXHIBIT A-6** **APPENDIX 27**

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | EEOC<br>FEPA | 520-2024-02399 |
| **Texas Workforce Commission Civil Rights Division**<br>*State or local Agency, if any* | | and EEOC |

Compliance at some point. There was a woman (Indian) working in the Compliance team as an analyst who left the company to pursue an outside opportunity in winter of 2023. Despite my constant inquiries about moving to that department, I was never offered the position I was promised or an interview. It is my understanding (as recent as March 2024 when I went on STD leave) that interviews were being held to replace that Compliance analyst position and that all individuals interviewed were Indian. In the beginning of 2024, my team was sent an email that we were being placed back on phones and if we didn't like it then we can take a month's severance and quit. This was a difference in treatment I witnessed in 2023 when three younger female employees who the Respondent tried to put back on phones, refused and instead of being reprimanded, they were promoted that same year. We were placed back on phones despite being told that we would never have to go back on phones after our promotions to the Escalation dept. I then made a complaint of our team being placed back on phones and not receiving the promotion we were promised. Afterwards, I faced retaliation, and I was written up for not being on the phones the first day that change went into effect but not only had I not received the headset they'd mailed out yet, but I'd also called out sick that morning shortly after clocking in for the day. I was feeling very ill then called off completely a short time later the same morning. I was ill for several days after and received emails from Madeline Eckhart and Janet Hefferan threatening punishment/possibly termination for not being on phones and for not being at work. I submitted a sick note during my absence and an additional sick note upon my return to work, per their new policy that employees in our department must present a doctor's note upon returning to work if they are absent three or more days. I was still marked as "unexcused" and written up (I had never once during my time with the company ever been disciplined or written before. This was retaliatory and I believe they were trying to pad my HR file and possibly terminate me as quickly as possible). I tried to appeal this in a meeting with HR generalist, Janet Hefferan, and she said it would stand and Madeline Eckhart backed that decision. I was not provided with any options to file an appeal or grievance since I didn't agree with the action, nor did we have an HR director or a handbook with written policies to refer to. I also brought this to my lead Lia's attention, and she told me there was nothing to be done if they chose to write me up. They then enacted a rule for my dept. which restricted the amount of PTO and sick days we could take and created a point system which did not apply to any other dept. in the company. I also felt discriminated against based on my disability as when I informed Lia of my disability she stated, "What makes you people think that just because you are sick that the company should pay for it?" This gives me fear of retaliation when I return from short term disability leave.

I believe that I have been discriminated against based on my age in violation of the Age Discrimination in Employment Act of 1967, as amended, based on my disability in violation of the Americans with Disabilities Act of 1990, as amended and based on my race and retaliated against in violation of Title VII of the Civil Rights Act of 1964, as amended.

| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
| I declare under penalty of perjury that the above is true and correct.<br>**Digitally Signed By: Angella Everett**<br>**07/23/2024**<br>*Charging Party Signature* | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT<br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (*month, day, year*) |

**PRIVACY ACT STATEMENT:** Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1. **FORM NUMBER/TITLE/DATE.** EEOC Form 5, Charge of Discrimination (11/09).

2. **AUTHORITY.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

3. **PRINCIPAL PURPOSES.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

4. **ROUTINE USES.** This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

5. **WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.** Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

**NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW**

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA. Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge. When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter. Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so within 15 days of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

**NOTICE OF NON-RETALIATION REQUIREMENTS**

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

# EXHIBIT 2

EEOC Determination and Notice of Rights (Issued On: 08/18/2025)

Gmail **A B <aevere04@gmail.com>**

---

## Time-Sensitive EEOC Final Decision for EEOC Charge 520-2024-02399 / Decisión final urgente de la EEOC por el cargo 520-2024-02399

**EEOC** <no-reply@service.eeoc.gov> Mon, Aug 18, 2025 at 4:26 PM
To: Angella Everett <aevere04@gmail.com>

**U.S. Equal Employment Opportunity Commission**

The Equal Employment Opportunity Commission (EEOC) has issued a final decision regarding EEOC Charge 520-2024-02399, which can be found in the document titled **Determination and Notice of Rights** in the EEOC Public Portal. This email, as well as the Determination and Notice of Rights, is official notice that the EEOC has dismissed the above-referenced EEOC charge and that the Charging Party has the right to sue the respondent(s) on this charge in court within 90 days of receipt of this notice. The Determination and Notice of Rights also provides additional information related to filing suit under the laws enforced by the EEOC, including important time limits. Please note that the 90-day deadline for Charging Party to file a lawsuit is set by law and failure to file a lawsuit in that time may result in the inability to move forward with a lawsuit.

**You should log into the EEOC Public Portal, download and read the Determination and Notice of Rights as soon as possible. You should also keep a record of the date you received this notice and save the downloaded Determination and Notice of Rights.**

This email is an official notification from the Equal Employment Opportunity Commission (EEOC) regarding charge 520-2024-02399. Please do not reply to this email.

*Notice of Confidentiality: This email may contain privileged and confidential information, including information protected by federal and state privacy laws. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution, or duplication of this communication is strictly prohibited and may be unlawful. If you are not the intended recipient, please contact (800) 669-4000 and destroy all copies of the original message and attachments.*

La Comisión para la Igualdad de Oportunidades de Empleo (EEOC, por sus siglas en inglés), ha emitido una decisión final con respecto al cargo de dicha Comisión 520-2024-02399, que se encuentra en el documento titulado **Determinación y notificación de derechos** en el Portal Público de la EEOC. Este correo electrónico, así como la Determinación y notificación de derechos, es un aviso oficial que indica que la EEOC ha desestimado el cargo mencionado anteriormente y que la parte acusadora tiene derecho a demandar a los responsables de este cargo en un tribunal en los 90 días posteriores a la recepción de este aviso. La Determinación y notificación de derechos también proporciona información adicional relacionada con la presentación de la demanda bajo las leyes aplicadas por la EEOC, incluyendo límites de tiempo importantes. Por favor, tenga en cuenta que la fecha límite de 90 días para que la parte demandante presente la demanda está determinada por ley y que, en caso de no presentarla en ese plazo, podría dar como resultado la incapacidad de seguir adelante con esta.

**Debe registrarse en el Portal Público de la EEOC, descargar y leer la Determinación y notificación de derechos lo antes posible. Además, debería tomar nota de la fecha en la que recibió este aviso y guardar la Determinación y notificación de derechos descargada.**

Este correo electrónico es una notificación oficial de la EEOC relacionado con el cargo 520-2024-02399. Por favor, no responda a este correo electrónico.

*Aviso de confidencialidad: La información contenida en este correo electrónico puede contener información privilegiada y confidencial, incluida información protegida por las leyes de privacidad federales y estatales. Está destinada únicamente al uso de la(s) persona(s) nombrada(s) anteriormente. Si usted no es el(la) destinatario(a) previsto(a), se le notifica que cualquier revisión, difusión, distribución o duplicación de esta comunicación está estrictamente prohibida y puede ser*

*ilegal. Si usted no es el(la) destinatario(a) previsto(a), póngase en contacto con el (800) 669-4000 y destruya todas las copias del mensaje original y los archivos adjuntos.*

# EXHIBIT 3

EEOC Transmittal Email, August 18, 2025, 4:26 PM

Gmail **A B <aevere04@gmail.com>**

## Time-Sensitive EEOC Final Decision for EEOC Charge 520-2024-02399 / Decisión final urgente de la EEOC por el cargo 520-2024-02399

**EEOC** <no-reply@service.eeoc.gov> Mon, Aug 18, 2025 at 4:26 PM
To: Angella Everett <aevere04@gmail.com>

**U.S. Equal Employment Opportunity Commission**

The Equal Employment Opportunity Commission (EEOC) has issued a final decision regarding EEOC Charge 520-2024-02399, which can be found in the document titled **Determination and Notice of Rights** in the EEOC Public Portal. This email, as well as the Determination and Notice of Rights, is official notice that the EEOC has dismissed the above-referenced EEOC charge and that the Charging Party has the right to sue the respondent(s) on this charge in court within 90 days of receipt of this notice. The Determination and Notice of Rights also provides additional information related to filing suit under the laws enforced by the EEOC, including important time limits. Please note that the 90-day deadline for Charging Party to file a lawsuit is set by law and failure to file a lawsuit in that time may result in the inability to move forward with a lawsuit.

**You should log into the EEOC Public Portal, download and read the Determination and Notice of Rights as soon as possible. You should also keep a record of the date you received this notice and save the downloaded Determination and Notice of Rights.**

This email is an official notification from the Equal Employment Opportunity Commission (EEOC) regarding charge 520-2024-02399. Please do not reply to this email.

*Notice of Confidentiality: This email may contain privileged and confidential information, including information protected by federal and state privacy laws. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution, or duplication of this communication is strictly prohibited and may be unlawful. If you are not the intended recipient, please contact (800) 669-4000 and destroy all copies of the original message and attachments.*

La Comisión para la Igualdad de Oportunidades de Empleo (EEOC, por sus siglas en inglés), ha emitido una decisión final con respecto al cargo de dicha Comisión 520-2024-02399, que se encuentra en el documento titulado **Determinación y notificación de derechos** en el Portal Público de la EEOC. Este correo electrónico, así como la Determinación y notificación de derechos, es un aviso oficial que indica que la EEOC ha desestimado el cargo mencionado anteriormente y que la parte acusadora tiene derecho a demandar a los responsables de este cargo en un tribunal en los 90 días posteriores a la recepción de este aviso. La Determinación y notificación de derechos también proporciona información adicional relacionada con la presentación de la demanda bajo las leyes aplicadas por la EEOC, incluyendo límites de tiempo importantes. Por favor, tenga en cuenta que la fecha límite de 90 días para que la parte demandante presente la demanda está determinada por ley y que, en caso de no presentarla en ese plazo, podría dar como resultado la incapacidad de seguir adelante con esta.

**Debe registrarse en el Portal Público de la EEOC, descargar y leer la Determinación y notificación de derechos lo antes posible. Además, debería tomar nota de la fecha en la que recibió este aviso y guardar la Determinación y notificación de derechos descargada.**

Este correo electrónico es una notificación oficial de la EEOC relacionado con el cargo 520-2024-02399. Por favor, no responda a este correo electrónico.

*Aviso de confidencialidad: La información contenida en este correo electrónico puede contener información privilegiada y confidencial, incluida información protegida por las leyes de privacidad federales y estatales. Está destinada únicamente al uso de la(s) persona(s) nombrada(s) anteriormente. Si usted no es el(la) destinatario(a) previsto(a), se le notifica que cualquier revisión, difusión, distribución o duplicación de esta comunicación está estrictamente prohibida y puede ser*

*ilegal. Si usted no es el(la) destinatario(a) previsto(a), póngase en contacto con el (800) 669-4000 y destruya todas las copias del mensaje original y los archivos adjuntos.*

# EXHIBIT 4

USPS Postage and Certified Mail Receipts, November 17, 2025

9589 0710 5270 2530 5585 15

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®*.

Fort Worth, TX 76102

OFFICIAL USE

| | |
|---|---|
| Certified Mail Fee $5.30 | 0018 |
| $ | 85 |
| Extra Services & Fees (check box, add fee as appropriate) $4.40 | |
| ☐ Return Receipt (hardcopy) $ $0.00 | |
| ☐ Return Receipt (electronic) $ $0.00 | Postmark Here |
| ☐ Certified Mail Restricted Delivery $ $0.00 | NOV 17 2025 |
| ☐ Adult Signature Required $ $0.00 | CENTER CITY OKLAHOMA CITY OK 73102 |
| ☐ Adult Signature Restricted Delivery $ | |
| Postage $4.14 | 11/17/2025 |
| $ | |
| Total Postage and Fees $13.84 | |
| $ | |

Sent To

Street and Apt. No., or PO Box No.

City, State, ZIP+4®

PS Form 3800, January 2023 PSN 7530-02-000-9047 See Reverse for Instructions

**UNITED STATES POSTAL SERVICE.**

CENTER CITY
305 NW 5TH ST
OKLAHOMA CITY, OK 73102-9998
www.usps.com

11/17/2025 07:02 PM

TRACKING NUMBERS
9589 0710 5270 2530 5585 15

TRACK STATUS OF ITEMS WITH THIS CODE
(UP TO 25 ITEMS)

TRACK STATUS BY TEXT MESSAGE
Send tracking number to 28777 (2USPS)
Standard message and data rates may apply

TRACK STATUS ONLINE
Visit https://www.usps.com/tracking
Text and e-mail alerts available

PURCHASE DETAILS

| Product | Qty | Unit Price | Price |
|---|---|---|---|
| First-Class Mail® Large Envelope<br>Fort Worth, TX 76102<br>Weight: 0 lb 9.60 oz<br>Estimated Delivery Date<br>Fri 11/21/2025 | 1 | | $4.14 |
| Certified Mail®<br>Tracking #:<br>9589 0710 5270 2530 5585 15 | | | $5.30 |
| Return Receipt<br>Tracking #:<br>9590 9402 9835 5266 4561 88 | | | $4.40 |
| Total | | | $13.84 |
| 5c Red Tulips | 1 | $0.05 | $0.05 |
| $2 Floral Geo | 2 | $2.00 | $4.00 |
| $5 Floral Geo | 1 | $5.00 | $5 |

Grand Total: $22.[illegible]

Debit Card Remit $22.89
Card Name: VISA
Account #: XXXXXXXXXXXX3816
Approval #: 605282
Transaction #: 207
Receipt #: 060919
Debit Card Purchase: $22.89
ATN: A0000000980840 Contactless

USPS TRACKING® & CUSTOMER RECEIPT
9114 9999 4431 4578 8161 52
For Tracking or inquiries go to USPS.com or call 1-800-222-1811.

# EXHIBIT 5

Signed USPS Return Receipt Card (Received November 19, 2025)

**SENDER: *COMPLETE THIS SECTION***

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Clerk of Court
United States District Court
Northern District of Texas
501 W. 10th Street
Fort Worth, TX 76102

9590 9402 9835 5266 4561 88

2. Article Number (Transfer from service label)
9589 0710 5270 2530 5585 15

***COMPLETE THIS SECTION ON DELIVERY***

A. Signature
X [signature]
☐ Agent
☐ Addressee

B. Received by (*Printed Name*)
ELLIS

C. Date of Delivery
1/19/26

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053 Domestic Return Receipt

**USPS TRACKING #**

9590 9402 9835 5266 4561 88

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

**United States Postal Service**

• Sender: Please print your name, address, and ZIP+4® in this box•

A. Everett
1209 N. Saginaw Blvd.
Ste. G #145
Saginaw, Texas [76179]

# EXHIBIT 6

Clerk's Office Telephone Call Log, December 18, 2025


Thursday, December 18, 2025
[redacted] 7:21 PM
[redacted] 5:28 PM
[redacted] 5:25 PM
[redacted] 3:34 PM
[redacted] 3:33 PM
[redacted] 3:30 PM
US District Court Clerk
+1 817-850-6600
Outgoing call, 2 mins 23 sec
2:17 PM

# EXHIBIT 7

CM/ECF Registration Confirmation (Processed January 22, 2026)

Gmail **A B <aevere04@gmail.com>**

## NextGen CM/ECF Registration Status

1 message

**do_not_reply@psc.uscourts.gov** <do_not_reply@psc.uscourts.gov> Thu, Jan 22, 2026 at 2:27 PM
Reply-To: assist_team@txnd.uscourts.gov
To: aevere04@gmail.com

This email is notification that your NextGen CM/ECF electronic filing registration has been processed. You may check your E-Filing Status by visiting the "Manage My Account" section of the PACER web site and selecting "Check E-File Status" option from the "Maintenance" tab or use this link, https://pacer.psc.uscourts.gov/pscof/manage/efileStatus.jsf.

Account Number: 8788730
Court: TEXAS NORTHERN DISTRICT COURT
Date/Time Submitted: 01/22/2026 14:26:53 CST
Transaction ID: 59047
Request: Registration
Transaction Status: Processed

NOTE: Please do not reply to this message. This is an automated message sent from an unmonitored mailbox. If you have questions or comments, please email them to assist_team@txnd.uscourts.gov.

# EXHIBIT 8

First Action ECF No. 11 (Order Declining to Reopen)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **ANGELLA EVERETT,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:25-cv-01312-O-BP** |
| | § | |
| **NOVO PLATFORM INC.,** | § | |
| | § | |
| **Defendant.** | § | |

**ORDER**

Before the Court is Plaintiff's Motion to Reopen the Case, ECF No. 9. A plaintiff may file a second suit for claims dismissed without prejudice, but the Court declines to reopen the dismissed case. *See Lambert v. U.S.*, 44 F.3d 296, 298 (5th Cir. 1995).

**SO ORDERED** this **3rd day** of **Februrary, 2026**.

Reed O'Connor
CHIEF UNITED STATES DISTRICT JUDGE

# EXHIBIT 9

TWC Employment Intake Supervisor Alex Stewart Email Confirmation

Gmail **A B <aevere04@gmail.com>**

# Records Request — EEOC Charge No. 520-2024-02399 (Dual-Filed with TWC Civil Rights Division) — Everett v. Novo Platform Inc.

2 messages

**A B** <aevere04@gmail.com> Fri, Jul 17, 2026 at 3:29 AM
To: EEOIntake@twc.texas.gov

Dear Texas Workforce Commission Civil Rights Division:

I am the charging party on EEOC Charge No. 520-2024-02399, Angella Everett v. Novo Platform Inc. The charge was signed and filed on July 23, 2024, and was dual-filed with the Texas Workforce Commission Civil Rights Division pursuant to the worksharing agreement between the EEOC and the Division. The EEOC San Antonio Field Office processed the charge and issued its final decision on August 18, 2025.

I respectfully request that the Division confirm the following in writing:

1. Whether the Division ever issued a notice of right to file a civil action on this charge under Texas Labor Code Section 21.252, and if so, the date it was issued and the address to which it was sent;

2. Whether the Division's file reflects any correspondence issued to me on this charge, by mail or email, and if so, the dates and the addresses used.

I also request a complete copy of the Division's file on this charge, or instructions on how to obtain it.

For identification purposes: my name is Angella Everett; the respondent is Novo Platform Inc.; the charge number is 520-2024-02399; the address on the charge was P.O. Box 12108, Austin, TX 78711. My current mailing address is 1209 N. Saginaw Blvd., Ste. G #145, Saginaw, Texas 76179. I can be reached at this email address or at 817-458-8353.

Please reply in writing to this email address. If any portion of this request should be directed to a different office or submitted through the Commission's public information request process, I would appreciate your letting me know so I may do so promptly.

Thank you for your assistance.

Respectfully,

Angella Everett
1209 N. Saginaw Blvd., Ste. G #145
Saginaw, Texas 76179
817-458-8353
aevere04@gmail.com

---

**Stewart,Alex E** <alex.stewart@twc.texas.gov> Fri, Jul 17, 2026 at 5:08 AM
To: A B <aevere04@gmail.com>

Good Morning,

EEOC charge 520-2024-02399 was filed with the EEOC. As such, the TWCCRD had no oversight of the investigation or records of the matter.

The state right to file civil action based on the dual filing would only have been issued if it was requested by the Charging Party

You may request any records pertaining to the case through TWC's Open Records Division at: Open Records Requests - Texas Workforce Commission.

V/R,

Alex Stewart

Employment Intake Supervisor - Civil Rights Division

Texas Workforce Commission

101 E. 15th Street, Room 154

Austin, TX  78778-0001

P: 888-452-4778; Facsimile: 512-463-2643

Civil Rights Division - Texas Workforce Commission

Office Hours: 7:00am – 4:00pm

---

**From:** A B <aevere04@gmail.com>
**Sent:** Friday, July 17, 2026 3:29 AM
**To:** EEO Intake <eeointake@twc.texas.gov>
**Subject:** Records Request — EEOC Charge No. 520-2024-02399 (Dual-Filed with TWC Civil Rights Division) — Everett v. Novo Platform Inc.

You don't often get email from aevere04@gmail.com. Learn why this is important

**CAUTION:** Email not from TWC System. Use care when clicking links and opening attachments.

[Quoted text hidden]

# EXHIBIT 10

Rylee Gulde Email, January 17, 2024 (Customer Support and Success Merger)

Gmail **A B <aevere04@gmail.com>**

# Fwd: Customer Support and Success Merger

**Angel Everett** <angel.everett@novo.co> Wed, Jan 17, 2024 at 8:08 PM
To: aevere04@gmail.com

---------- Forwarded message ---------
From: **Rylee Gulde** <rylee@novo.co>
Date: Wed, Jan 17, 2024, 11:54 AM
Subject: Customer Support and Success Merger
To: Angel Everett <angel.everett@novo.co>, Carrington Miller <carrington.miller@novo.co>, Kiara Fuertes <kiara.fuertes@novo.co>, Janis Escobar <janis.escobar@novo.co>
Cc: Lia Mebane <lia.mebane@novo.co>, Madeline Eckhart <madeline@novo.co>, Grant Sahag <grant@novo.co>

Dear Team,

We hope this message finds you well. We have some significant updates regarding the upcoming merger of the Northstar team into our current Support function, marking the formation of a unified Onshore Success team, effective January 22, 2024.

**Unified Onshore Success Team:**
The merger involves bringing together Escalations and NS agents to operate as one cohesive team under the guidance of TLs Lia and Chanelle. Both teams will report to Madeline, providing comprehensive phone and ticket support for Novo's most crucial customer segment.

**Objective and Benefits:**
This strategic move is aimed at enhancing efficiency and support for our Onshore agents. The decision to integrate Northstar into the broader team is driven by a desire to eliminate silos and foster collaboration, ultimately improving resources available to our Onshore agents.

**Leadership and Team Restructuring:**
We are pleased to announce that Robbi Blackwell will take on the role of K&T manager, focusing on completing the SOP project and overseeing Macro and FAQ strategies. Additionally, Lina Lopez will be joining the Cards Program Team in Business Operations under Natalie.

Excitingly, Skylar and Dante will transition to the Enablement umbrella, reporting to Robbi. This move is designed to leverage CS Ops hard work, elevating tech issue resources and workflows to a new level.

**Change Management:**
We understand that these changes may pose challenges, especially as we transition from dynamic roles to more formal structures. We assure you that these adjustments are crucial for the department's success in 2024.

**Severance Package Offer:**
In acknowledgment of the changes, we are offering a severance package comprising 1 month of severance pay and 1 month of COBRA healthcare for Escalation agents who may prefer not to continue as support agents. Please review the provided benchmarks for our 2024 expectations and indicate your decision

regarding the severance package to your Manager no later than Wednesday, January 24th, and your final working day will be on Friday, January 26th if you decide to take the severance package.

**Performance Expectations:**

Outlined below are the benchmarks and expectations for Onshore agents in 2024. Failure to meet the expectations outlined below for three consecutive weeks will result in the initiation of a performance improvement plan.

**Onshore Expectations: 100% ticket and phone call focus**

Productivity: Monday - Friday

- Total Comments (Internal + Public) >545 per week
- Public Comments > 213 per week
- Calls > 34 per week
- Solved > 100 per week
- Avg Requester Wait time < 3hrs
- QA > 92%
- People related CSAT > 70%
- Available for a flexible schedule within reason
  - To ensure weekend coverage, everyone will need to work one weekend day per month (calls + tickets)
    - 9am - 6pm
  - Holiday coverage as needed
  - Weekday block options:
    - 8am - 5pm
    - 9am - 6pm
    - 10am - 7pm

**Punctuality:**

- Log in by 9 am every workday with Slack status as active.
- Attend the daily stand-up with your TL at 9:15 - please have your cameras on.
- Adhere to the scheduled 1-hour lunches each day, with two 15-minute breaks.
- Attend weekly 1v1s with your TL.
- Participate in quarterly skip-level meetings with Madeline.

**Attendance and Leave Policy:**

- Failure to notify your TL for an unexpected absence will result in 1 verbal warning. Subsequent occurrences will lead to a performance improvement plan.
- Abuse of the sick leave policy will result in a conversation with HR and a subsequent performance improvement plan.

**Specialized Focus Areas:**

- As part of our team restructuring, we are moving back to a model where each agent specializes in either Payments or Platforms. For each section, we will need one Subject Matter Expert (SME) with a focus on:
  - ACH
  - Debit
  - Checks
  - Features/Integrations
  - Accounts & Fraud

**SME Selection Criteria:**

SMEs will be selected based on productivity metrics and attention to detail. Adjusted benchmarks will emphasize quality over quantity. SMEs will be actively involved in handling difficult escalations and providing guidance based on their subject expertise.

**Team Structure:**

One team, led by Chanelle, will be dedicated to Payments, while another team, led by Lia, will focus on Platforms.

We appreciate your commitment to these expectations, as they are crucial in maintaining our team's efficiency and ensuring the highest level of service for our customers.

Best regards,
Rylee

novo

**Rylee Gulde**
Quality Assurance Manager
rylee@novo.co | novo.co
43 W 23rd St, 3rd fl, New York, NY, 10010

# EXHIBIT 11

Job Description, Job Level S4 (Captured December 18, 2023)

ID Theft Scenarios and Esc | Out of Scope tickets sent to | Dec 13, 2023 | Escalations | JD: CS Escalation Specialist | SOP Revamp - Stop Paym | Mobile Deposit Status - Age | SOP Creation Guidelines

docs.google.com/document/d/1dfbrC7D74cVaKrYTSjMPb6E-zVDJpnFzaPKeYjq0HuQ/edit

novo.co bookmarks | Unsolved tickets –... | 1Password for Novo | Mobile Check Depo... | Checks Questions... | SOP.CS.Q1.22: Zero... | ACH & Check Flows... | How to Write a Che... | Check Rejections E... | Payment Timing - N... | All Bookmarks

JD: CS Escalation Specialist

File Edit View Insert Format Tools Extensions Help

Share

Menus 100% Normal text Roboto 11 Editing

| POSITION OVERVIEW | | | |
|---|---|---|---|
| **Internal Role Title** | Escalation Specialist | **External Role Title** | Escalation Specialist |
| **Department** | CX | **Hiring Manager** | |
| **Location** | NYC/Remote | **Job Level** | S4 |
| **Target Offer Date** | | **Target Start Date** | |
| **ATS Link** | *N/A for now* | **Financial Approval? (Yes/ No)** | |

| COMPETENCY CATEGORIES (company wide) | SCORECARD ATTRIBUTES (role specific) |
|---|---|
| **TECHNICAL SKILLS** (what is required to do the role) | • **PLEASE ADD ROLE SPECIFIC ATTRIBUTES HERE**<br>• Data Analisis<br>• Systems Proficiency<br>  ○ Zendesk<br>  ○ Reporting<br>  ○ GSuite<br>  ○ Slack<br>  ○ JIRA<br>  ○ Asana<br>  ○ Confluence<br>• Project Management<br>  ○ Planning |

Dec 18 4:27

# EXHIBIT 12

Job Description, Job Level S3, January 31, 2024

JD 2024: Customer Support Specialist (Onshore)

| POSITION OVERVIEW | | | |
|---|---|---|---|
| **Internal Role Title** | Onshore Customer Support Specialist | **External Role Title** | Customer Support Specialist |
| **Department** | CS | **Hiring Manager** | Madeline Eckhart |
| **Location** | Wilmington, DE/ Remote | **Job Level** | S3 |
| **Target Offer Date** | | **Target Start Date** | Feb 2024 |
| **ATS Link** | *N/A for now* | **Financial Approval? (Yes/ No)** | |

| COMPETENCY CATEGORIES (company wide) | SCORECARD ATTRIBUTES (role specific) |
|---|---|
| **TECHNICAL SKILLS** (what is required to do the role) | • Systems Proficiency<br>◦ Zendesk<br>◦ Reporting<br>◦ GSuite<br>◦ Slack<br>◦ JIRA<br>◦ Asana<br>◦ Confluence<br>• Project Management<br>◦ Planning<br>◦ QA Testing<br>◦ Requirements Gathering |
| **EFFECTIVENESS & OPERATIONAL SKILLS** | • Adapts to Changing Priorities<br>• Attention to Detail<br>• Highly organized<br>• Efficiency Analysis for systems & process<br>• Team Coordination<br>• Group and Individual Benchmark reporting<br>• Group and Individual benchmark improvements |
| **COLLABORATION & COMMUNICATION** | • Work alongside Team Members to contribute to internal projects that will result in overall improvement of processes and daily operations<br>• Data Driven<br>• Flexible |

# EXHIBIT 13

January 17, 2024 Team Slack Thread

Wednesday, January 17th

**Kiara** 12:03 PM
I just want to clarify that this part of Rylee's email only pertains to the NS agents, we will not be taking calls correct?
Screenshot 2024-01-17 at 11.03.24 AM.png

> Rylee Guide
> to Angel, Carrington, me, Janis, Lia, Madeline, Grant
>
> Dear Team,
>
> We hope this message finds you well. We have some significant updates regarding the upcoming merger of the Northstar team into our current Support function, marking the formation of a unified Onshore Success team, effective January 22, 2024.
>
> **Unified Onshore Success Team:**
> The merger involves bringing together Escalations and NS agents to operate as one cohesive team under the guidance of TLs Lia and Chanelle. Both teams will report to Madeline, providing comprehensive phone and ticket support for Novo's most crucial customer segment.

4 replies Last reply 6 months ago

**Kiara** 12:04 PM
@lia.mebane

**Carrington Miller** 12:05 PM
Back from lunch

**Angel** 12:05 PM
Nope, I do believe that says they now expect us to go back on calls and if we don't like it we can take the one-month severance and go.. smh
1

**Janis E.** 12:17 PM

**Kiara** 6 months ago
I just want to clarify that this part of Rylee's email only pertains to the NS agents, we will not be taking calls correct?
Screenshot 2024-01-17 at 11.03.24 AM.png

> Rylee Guide
> to Angel, Carrington, me, Janis, Lia, Madeline, Grant
>
> Dear Team,
>
> We hope this message finds you well. We have some significant updates regarding the upcoming merger of the Northstar team into our current Support function, marking the formation of a unified Onshore Success team, effective January 22, 2024.
>
> **Unified Onshore Success Team:**
> The merger involves bringing together Escalations and NS agents to operate as one cohesive team under the guidance of TLs Lia and Chanelle. Both teams will report to Madeline, providing comprehensive phone and ticket support for Novo's most crucial customer segment.

4 replies

**Lia Mebane** 6 months ago
yes honey im so sorry it pertains to everyone

**Kiara** 6 months ago
nooooo

**Kiara** 6 months ago
What happened to us getting upscaled? this feels like a demotion 😭

**Lia Mebane** 6 months ago
it certainly does to me as well

# EXHIBIT 14

Plaintiff's January 18, 2024 Round Table Written Recap to Human Resources

Gmail

A B <aevere04@gmail.com>

**Copy of Angel Everett HR-ES Team Round Table Followup**

**Angel Everett (via Google Docs)** <drive-shares-noreply@google.com> Tue, Jul 23, 2024 at 10:17 PM
Reply-To: Angel Everett <angel.everett@novo.co>
To: aevere04@gmail.com

# Angel Everett attached a document

Angel Everett (angel.everett@novo.co) has attached the following document:

Followup sent to Janet & Pat in HR after the video meeting between HR & ES Team

Copy of Angel Everett HR-ES Team Round Table Followup

*Snapshot of the item below:*

Angel Everett
1.18.2024

When I was interviewed by Hanna, I was receiving other job offers but I ultimately chose Novo because of the features that were presented.
For starters, I have been a small business owner for over twenty years so helping other small businesses realize their dreams jumped out at me. I was also very interested in advancing my career in finance and I wanted a shift from the casino background I knew (I'd experienced very limited growth in that arena and extreme bullying).
The vision that was painted was one of collaboration, growth, and innovation. A work environment and culture that was inclusive and progressive, and aimed to break the average rigid corporate model while providing a top-tier experience for our customers. (I was always told upfront that Novo aimed to be named one of the best places to work alongside a company like Google!)
A place where input was heard and valued, teamwork was paramount, and a negative/adversarial environment was not tolerated.
It was expressed to me that Novo valued positive mental health and work-life balance for their employees because happy and healthy employees = loyal, productive employees.
Also, if you were dedicated to the company and showed interest and talent in a particular area, there was growth/promotion available and would be given support as Novo wanted to keep valuable talent within the company.  I was sold and invested myself fully in Novo!
I worked and waited patiently for a year to be onboarded internally with Novo because I believed in the vision and product so much.

Over my time here at Novo, that dynamic has declined drastically.

I understand that startup life can come with a lot of change, sometimes very sudden and drastic. My team and I have been flexible in taking things as they have come and risen to every occasion when we were told to pivot for the company's needs.

Over the past six months, ES Team has taken on more duties and responsibilities, often with unclear direction and minimal to sometimes no training for our new duties, while continually being promised growth and promotion that never comes. Sometimes the changes made are very sudden and cause us to backtrack and correct tasks that were just recently completed. All the while, my teammates and I have maintained stellar QA scores.

ES Team dedicated a significant portion of Q3 to the Ubiquity project, contributing to measurable improvements confirmed by the QA Team.
Training Impact Analysis Reports
This came about due to the issues we were seeing in tickets and hearing on calls serviced by Ubiquity. We identified several gaps and weaknesses and were subsequently tasked with completing coaching sheets, conducting 1 on 1 coaching sessions with Ubiquity agents and their Team Leads, creating training sessions, and conducting training sessions with the Ubiquity team.
We conducted these training sessions based on the vertical we were named SME of (I was named Checks SME, for example, due to my extensive experience and work in the Checks vertical).
Below are examples where I am identified as the Checks SME and complete corresponding duties:

At the end of Q3, ES Team was instructed to complete an Employee Performance Review Self-Assessment (mine can be found here:Angel Everett- Employee Performance Review Self-Assessment) and our Team Lead was to complete one for each of us as well. This was to map out promotion and what that transition would look like.

I was even tapped for a move to Compliance in Q2.

I was told this did not happen at the time due to restructuring the department/the department not having the budget for a new member at the time. However, I was told I could start mapping out a path toward that team. I should just continue to perform well in my current duties while collaborating anywhere I can with Compliance. I have done so since that time as there have been several instances where I have worked in close collaboration with Daronn (Compliance) after identifying gaps in order to initiate changes to certain processes such as the ID Theft process. I have been in several conversations and meetings with Compliance and made contributions toward improving processes for BBB complaints and subpoenas, eventually conducting training and handing over those tasks to LegalOps.
Example below:



In Q4, the ES Team was reassigned to the Macro clean-up Project and then the SOP Project and tasked with creating new SOPs for our named SME verticals, all while managing our ES agent duties.

The pressure to complete project work with ever-changing guidelines and unclear guidelines along with our regular ES agent duties has been extremely stressful and anxiety-inducing. Being probed and scolded when there is a perception of “ES Team does not do as many tickets as NS” is very demoralizing when we are working on complicated and time-consuming tickets NS does not and we are working on Projects that NS is not.

The email ES Team received on 1/17 added to the mounting stress and was very jarring. I have been in fear for my job since veiled threats of my employment were made within the last few months and I fear retaliation as we were already told if we "complained and did not like our additional duties, we would be put back on tickets full-time after the new year" like it was a punishment we were up for.
I finally came clean with my Team Lead about how I was feeling since I am recently pursuing mental health assistance to help cope with the extreme stress I have been trying to manage for months now.

Now this email detailing how my team and I are being demoted comes out and it's very targeted and as a punishment in retaliation for pointing out the lack of effective direction/management and citing that we are wearing many hats, not just working tickets.

I have been very loyal and devoted to this job and it feels like a huge slap in the face that instead of the growth and promotion we have continually been promised, we are told we are being catapulted backward, demoted, told we are now to work weekends, and worst of all, stripped of our earned SME titles and put up against NS agents in a seeming dog fight to compete for those titles we already had.

My understanding was always that a SME title came with immersion in a vertical's knowledge and mastery, not as an award in a contest. I am extremely uncomfortable with Novo creating a hostile climate where not only will I be punished for wanting my voice to be heard, but I will also be pitted against my co-workers as if they are my competition/enemies to contend with.

ES Team has never functioned that way as we are extremely team-centric and customer-focused and we should not be mistreated this way or forced out.
I was just listening to Michael again in our All-Hands meeting this morning wondering how am I/we as a team supposed to be able to function from a place of being obsessed with our account holders when we are not being shown we have a safe space to operate and thrive in so we remain at our best to serve them?

Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA
You have received this email because angel.everett@novo.co shared a document with you from Google Docs.
Google Workspace

# EXHIBIT 15

January 18, 2024 QA Scores Exchange (April 14 - December 31, 2023)

**Thread**

**Lia Mebane** 6 months ago

BTW..here is your QA scores from April to Dec 2023

image.png

**Team KPI Table**

Search for agent | Apr 14th to Dec 31st

CS ENABLEMENT TEAM

| AGENT | QA SCORE | QA < 90 | CSAT |
|---|---|---|---|
| Company Average | 92.12% | 3 | 64.12% |
| Team Average | 97.5% | 0 | 52.32% |
| Angel | 95.73% | 0 | 37.7% |
| Carrington Miller | 96.57% | 0 | 64.32% |
| Janis Escobar | 99.83% | 0 | 18.6% |
| Kiara F | 99.32% | 0 | 56.35% |

Items per page: 25 | 1 - 4 of 4 items | 1 of 1 pages

1 1

3 replies

**Angel** 6 months ago

Am I remembering correctly that the CSAT scores for ES Team are known to be lower because of all the pushback we get/a ticket finally coming to us for a complicated issue and it's already been touched by other agents?

**Angel** 6 months ago

And that our QA score is what's most important?

**Lia Mebane** 6 months ago

Essentially, you're correct CSAT is dependant on multiple factors product, rejections etc. Not that QA is what's MOST important, but since the company is so focused on "quality" then in this case, it's more company initiative focused

# EXHIBIT 16

January 30-31, 2024 Slack Thread with Madeline Eckhart

**Carrington Miller, Kiara, Madeline Eckhart**

Tuesday, January 30th

**Madeline Eckhart** 4:15 PM
@Angel I felt a bit blindsided in that meeting - what was the miscommunication?

Reiterating that I am requesting an agenda on a Google doc that outlines your concerns, and once that is shared with me I will send a calendar invite to meet with you all

**Carrington Miller** 4:26 PM
We will get the Google document sheet together.

**Angel** 4:29 PM
To be completely frank, our entire team has felt blindsided by all all of these changes that are greatly different from what we've been told since last year. We'll put some items down on a Google sheet and hopefully we can set a time for an open discussion. @madeline (edited)

**Madeline Eckhart** 4:40 PM
I am sorry that is how the team is feeling, I will be happy to meet with you all to discuss this, and I will do my best to explain why we had to make this decision. Most of it has already been shared but Im happy to flesh out other questions and address concerns.

Im a bit disappointed in how this was raised earlier in the meeting - raising questions or concerns is welcomed, as open communication is important, but continuing to push back to your supervisor on a teamwide call is not constructive nor is it very respectful.

**Angel** 4:55 PM
I'm extremely disappointed that I'm now being scolded for exercising open communication and asking questions, even after we expressed yesterday that we wanted a private meeting with you.
I even asked earlier when a good time was for you and got no definitive reply past your continued request to create a document. That feels quite evasive and as if you do not care to hear our concerns or have an open dialogue with us as colleagues, adults, or human beings. It is not just you who deserves respect. I was not disrespectful toward you nor have I ever been.

Trying to force our team to take a clear demotion is counterproductive and beyond disrespectful after the loyalty and dedication we've poured into Novo. How do you think this treatment fosters camaraderie and a team-centric work culture? This continues to feel very hostile and targeted to the members of the ES Team.

Wednesday, January 31st

**Madeline Eckhart** 2:10 PM
hello team following up here - I would like to meet sooner rather than later to address some of these comments above. Please share your agenda by EOD if possible so we can connect tomorrow

Message Carrington Miller, Kiara, Madeline Eckhart

# EXHIBIT 17

February 1-8, 2024 Chanelle Slack Thread

**chanelle**

Thursday, February 1st

**Angel** 8:14 AM
Hi Chanelle. No disrespect to you at all but I won't be on the phone. I don't even have a headset yet by the way

**Angel** 8:43 AM
Hey, I'm calling off as my migraine spiked and I just threw up. I'll have a medical note when I return

**chanelle** 8:54 AM
Hi, thank you for letting me know && I'm very sorry to hear that - take care of yourself!

Friday, February 2nd

**chanelle** 9:22 AM
Hi, good morning! How are you feeling?
Were you planning on being out today as well?

Monday, February 5th

**chanelle** 8:06 AM
Good morning! Are you feeling any better?
Just wanted to check if you were going to be out today?

Thursday, February 8th

**Angel** 7:44 AM
Sorry I missed this, I wasn't on my computer at all. I sent Janet a email over the weekend and Lia checked on me on Monday. I will be on shortly to start my shift. I received my headset on Saturday and I'll turn in my notes to HR.

**chanelle** 7:51 AM

chanelle has **paused their notifications**

Message chanelle

Thursday, February 8th

**Angel** 7:44 AM
Sorry I missed this, I wasn't on my computer at all. I sent Janet a email over the weekend and Lia checked on me on Monday. I will be on shortly to start my shift. I received my headset on Saturday and I'll turn in my notes to HR.

**chanelle** 7:51 AM
Okay, thank you for letting me know. I hope you feel better, let me know if I can help with anything!

**Angel** 7:52 AM
I'm still not feeling well. I'm very dizzy and out of it and the meds are hard on my stomach.
2 replies Last reply 6 months ago

**Angel** 7:53 AM
I am reaching out to Janet now to turn in my notes

Anything I need to know? I have not been on calls in a very long time

**chanelle** 7:56 AM
Not anything in particular - phones haven't been super busy, I would just go over the cs-updates!

**Angel** 8:03 AM
Can I have a little bit to read through updates and such? I'm sending Janet my notes too

I see my ZD password also expired so taking care of that too

**chanelle** 8:04 AM
of course! I don't think I have you on until 10:30am
Onshore Schedule
Robbi | Google Sheets
Onshore Schedule

chanelle has **paused their notifications**

Message chanelle

# EXHIBIT 18

Eckhart Final Warning Email, February 1, 2024

Final Warning Inbox ×

**Madeline Eckhart** <madeline@novo.co>
to me, peopleops.us, Lia

Thu, Feb 1, 4:51PM

Dear Angel,

We hope this message finds you well. I am writing to address unsatisfactory performance in fulfilling core job responsibilities as outlined in your job description and email sent out on January 17th and to provide you with an opportunity to correct this situation.

This morning you informed the Team Lead over Slack that you would not be on the phone today as assigned. As previously communicated, all Customer Support Specialists are required to provide coverage for customer phone and ticket support following the Onshore Schedule.

We expect immediate improvement in taking customer phone calls during your scheduled call time. Regarding your headset, it was scheduled to arrive today but encountered issues delivering to your address, so Janet will be reaching out to assist. If you are facing any challenges or obstacles that hinder your ability to perform your duties, please do not hesitate to discuss them with your Lead or the HR department. We are here to support you, but you must take proactive steps to address and rectify the issues at hand.

This is your final warning and continued refusal to take customer phone calls as assigned will result in further disciplinary action up to and including termination. This warning will be placed in your personnel file, please acknowledge your receipt of this email. We genuinely hope to see positive changes in your performance moving forward.

Thank you for your attention to this matter.

Sincerely,

Madeline

--

novo

**Madeline Eckhart**
Senior BPO Manager
madeline@novo.co |
novo.co
222 Broadway, New York, NY 10038

# EXHIBIT 19

Hefferan Email, February 2, 2024, and Plaintiff's February 5, 2024
Reply

2/2 Follow-up External Inbox ×

**Janet Hefferan** <janet@novo.co>
to me, aevere04, Peopleops.Us

Fri, Feb 2, 4:49 PM

Hi Angel,

I just left you a voicemail a little while ago and wanted to follow up via email. I understand that you called out sick yesterday but we are concerned that you did not sign on today and no one has heard from you. We hope everything is okay and would like to ask you to contact us via phone, email, or Slack at your earliest convenience.

Thank you,
Janet

--

novo

**Janet Hefferan**
HR Generalist
janet@novo.co | novo.co
222 Broadway, 20th Fl New York, NY, 10038

---

**Angel Everett** <angel.everett@novo.co>
to Janet

Mon, Feb 5, 12:57 AM

Hi Janet, I've been pretty ill since Thursday and still not doing well.
I a medical note for Thurs/Fri and will be seen again tomorrow I'm not any better.

I'll reach out to speak to you in the next couple days when I'm better able speak on a call.

Angel

•••

# EXHIBIT 20

Hefferan No Call, No Show Absences Email, February 8, 2024

[Response Requested] No Call, No Show Absences External Inbox ×

Janet Hefferan <janet@novo.co>
to me, Peopleops.Us, aevere04, Madeline

Thu, Feb 8, 6:44 AM

Dear Angel,

I am writing to address your continued absence from work and related failure to communicate with your team. Below is a summary of your recent absences:

- You were absent on February 1st, 2nd, 5th, 6th and 7th. On February 2nd, 6th, and 7th, you were a "no call, no show."
- On February 2, 2024, I called the phone number we have on file for you and left a voicemail. I also sent you an email. You did not respond until February 5th, stating that you had a note from the previous week and would reach out in a couple of days. However, you did not do so.
- Team Lead, Chanelle Regulus contacted you via Slack on February 2nd and 5th. You did not respond to her or otherwise attempt to contact her.
- On February 6, 2024, Team Lead, Lia Mebane, reached out via email. You did not respond to her or otherwise attempt to contact her.

We expect that you will either return to work tomorrow or provide documentation for your continued absence. If you are unable to work due to illness, you may be eligible for leave, including Short Term Disability through Novo's Metlife policy.

If we do not hear from you by 9 AM ET tomorrow, February 9th, we will consider you to have abandoned your position and may terminate your employment accordingly.

We hope to hear from you soon.

Sincerely,
Janet Hefferan
HR Generalist

novo

**Janet Hefferan**
HR Generalist
janet@novo.co | novo.co
222 Broadway, 20th Fl New York, NY, 10038

# EXHIBIT 21

Headset Slack Messages (REDACTED: prior address and telephone number)

Thursday, February 1st

**Janet Hefferan** 2:32 PM
Hi Angel, I got a notification from Amazon about a package I sent, is this the correct shipping address for you?

image.png

**Angel Everett**

REDACTED

Thursday, February 8th

**Angel** 8:18 AM
Hi Janet. I responded to your email a little while ago.

I have the headset, I didn't get it until Saturday. There was some confusion and it ended up in the leasing office.

**Janet Hefferan** 8:23 AM
Hi Angel, I just responded, the soonest have time to meet at 9:30 or noon today, let me know what works better

I am glad to hear about the headset, Amazon marked it as undeliverable so I wasn't sure if you'd gotten it at all

# EXHIBIT 22

Teladoc Physician's Note, February 2, 2024 (REDACTED: prior address)

TELADOC

February 02, 2024

Angella Everett
REDACTED

To whom it may concern:

The above named individual had a consult with one of our physicians on 02/02/2024. Per physician recommendation, please excuse them from school/work for 3 days.

If further information is needed, please feel free to call.

Thank you,

Ryan Yang
Teladoc Physicians, P.A.
1945 Lakepointe Dr.
Lewisville, TX 75057
800-Teladoc

6726e19f84257892da458e0ad68b88cf

# EXHIBIT 23

CallonDoc Physician's Note, February 7, 2024 (REDACTED: date of birth)

CallonDoc
Your Doctor, Your Way!

# MEDICAL NOTE

## Patient Information

Patient Name: Angella Everett

Date of birth: REDACTED

To Whom It May Concern:

This is to certify that Angella Everett was under my care on 02/05/2024. This excuse note covers missed work days; 02/05/2024, 02/06/2024 and 02/07/2024.

Angella Everett may return to work and regular activities on 02/08/2024.

Do not hesitate to contact us with questions or concerns.

Adetunji Oshun (Primary Care Provider)

**Date** 02/07/2024

**Practice:** Family Medicine

# EXHIBIT 24

Onshore Standup 2.15 Document (Adjusted Point System), February 15, 2024

Onshore Standup 2.15

File Edit View Tools Help

Document details

Madeline Eckhart is the owner

Created on 7:08 AM

Modified at 9:14 AM by Madeline Eckhart

**Onshore Standup 2.15**

- Adjusted Schedule Adherence
  - What was shared in CS Merger: NS into Onshore has been modified, please see Copy of Attendance & Punctuality Policy 2024 for the adjusted Adherence requirements
  - Big Takeaways:
    - Adjusted Point System
      - Absence = 1 point
      - Tardy / Leave Early greater than one (1) hour = ½ point
      - Tardy / Leave Early less than one (1) hour = ¼ point
    - If you are unable to come into the office or log on for your shift for whatever reason you are to contact the Absence line no less than one hour before your scheduled start time by emailing onshore.attendance@novo.co

- Adding ZD Play Mode next week
  - The Play button guides you through the available tickets in a view automatically. After addressing the ticket, click Submit to update it and automatically move to the next available ticket.
  - Please see ZD Article: Play Mode for full details
  - This will automatically feed you tickets in the view that are not assigned to other individuals, in order of our priority.
  - If you are unable to action on a ticket you are fed, you will be able to skip the ticket. Please note skipped tickets will subject for review so that we can pinpoint areas that that need attention for additional training
  - Will have this for the NS assigned tickets view only at first.

- Changing settings for phones: "Away" status will automatically shift to "Online" after 7 min
  - With a 7 min fixed time for wrap-up, you will not have to worry about remembering to set yourself back to active after each call
  - Please continue to manually adjust the call status as you need - but this is an extra guardrail in place so that forgetting to adjust the status back to active will not result in an accidental 30 min wrap up time

# EXHIBIT 25

Defendant's Internal Metrics Workbook (Attendance, Daily, and Weekly Tabs)

Angel Metrics (4).xlsx

File Edit Insert Format Help

Arial 12

L - Late/Leave Early

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q | R | S |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | L - | | U - Unexcused | | | E - Excused Absence | | | | | | | | | | | | | |
| 2 | | | | | | | | | | | | | | | | | | | |
| 3 | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 4 | JANUARY | | | | | | | | | | | | | | | | | | |
| 5 | | | | | | | | | | | | | | | | | | | |
| 6 | | | | | | | | | | | | | | | | | | | |
| 7 | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 8 | FEBRUARY | U | U | | | U | U | U | | | | | | | | | | | |
| 9 | | | | | | | | | | | | | | | | | | | |
| 10 | | | | | | | | | | | | | | | | | | | |
| 11 | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 12 | March | E | | | | | | | | | | | | | | | | | |
| 13 | | | | | | | | | | | | | | | | | | | |
| 14 | | | | | | | | | | | | | | | | | | | |
| 15 | | | | | | | | | | | | | | | | | | | |
| 16 | | | | | | | | | | | | | | | | | | | |
| 17 | | | | | | | | | | | | | | | | | | | |
| 18 | | | | | | | | | | | | | | | | | | | |
| 19 | | | | | | | | | | | | | | | | | | | |
| 20 | | | | | | | | | | | | | | | | | | | |
| 21 | | | | | | | | | | | | | | | | | | | |
| 22 | | | | | | | | | | | | | | | | | | | |
| 23 | | | | | | | | | | | | | | | | | | | |
| 24 | | | | | | | | | | | | | | | | | | | |
| 25 | | | | | | | | | | | | | | | | | | | |
| 26 | | | | | | | | | | | | | | | | | | | |
| 27 | | | | | | | | | | | | | | | | | | | |
| 28 | | | | | | | | | | | | | | | | | | | |
| 29 | | | | | | | | | | | | | | | | | | | |
| 30 | | | | | | | | | | | | | | | | | | | |
| 31 | | | | | | | | | | | | | | | | | | | |
| 32 | | | | | | | | | | | | | | | | | | | |

Dailys | Weekly glance | Attendance

Angel Metrics (4).xlsx

File Edit Insert Format Help

Arial 10

| | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|
| 1–2 | Day of Week | Date | Public Comments | Total Comments | Tickets Solved | Completed Calls | Missed Calls | Total Call Duration | roductivity Score |
| 3 | Thur | 2/1/2024 | 1 | 1 | 0 | 0 | 0 | 0.00 | 0.15 |
| 4 | Fri-OOO | 2/2/2024 | 0 | 0 | 0 | 0 | 0 | 0.00 | 0.00 |
| 5 | Sat | 2/3/2024 | 0 | 0 | 0 | 0 | 0 | 0.00 | 0.00 |
| 6 | Sun | 2/4/2024 | 0 | 0 | 0 | 0 | 0 | 0.00 | 0.00 |
| 7 | Mon-OOO | 2/5/2024 | 0 | 0 | 0 | 0 | 0 | 0.00 | 0.00 |
| 8 | Tues-OOO | 2/6/2024 | 0 | 0 | 0 | 0 | 0 | 0.00 | 0.00 |
| 9 | Wed-OOO | 2/7/2024 | 0 | 0 | 0 | 0 | 0 | 0.00 | 0.00 |
| 10 | Thur | 2/8/2024 | 16 | 51 | 17 | 5 | 0 | 0.54 | 8.55 |
| 11 | Fri | 2/9/2024 | 19 | 50 | 14 | 5 | 0 | 0.47 | 8.30 |
| 12 | Sat | 2/10/2024 | 0 | 0 | 0 | 0 | 0 | 0.00 | 0.00 |
| 13 | Sun | 2/11/2024 | 0 | 0 | 0 | 0 | 0 | 0.00 | 0.00 |
| 14 | Mon | 2/12/2024 | 37 | 65 | 17 | 2 | 0 | 0.27 | 10.43 |
| 15 | Tues | 2/13/2024 | 26 | 52 | 16 | 4 | 1 | 0.55 | 8.73 |
| 16 | Wed | 2/14/2024 | 18 | 55 | 21 | 3 | 0 | 0.85 | 9.73 |
| 17 | Thur | 2/15/2024 | 38 | 66 | 26 | 2 | 1 | 0.65 | 11.27 |
| 18 | Fri-PTO | 2/16/2024 | 0 | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 19 | Sat | 2/17/2024 | 0 | 0 | 0 | 0 | 0 | 0.00 | 0.00 |
| 20 | Sun | 2/18/2024 | 0 | 0 | 0 | 0 | 0 | 0.00 | 0.00 |
| 21 | Mon-Holida | 2/19/2024 | 0 | 0 | 0 | 0 | 0 | 0.00 | 0.00 |
| 22 | Tues | 2/20/2024 | 19 | 48 | 11 | 4 | 2 | 0.00 | 9.60 |
| 23 | Wed-RDO | 2/21/2024 | 0 | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 24 | Thur | 2/22/2024 | 41 | 102 | 21 | 9 | 4 | 0.76 | 45.55 |
| 25 | Fri | 2/23/2024 | 32 | 58 | 13 | 3 | 1 | 0.73 | 11.00 |
| 26 | Sat | 2/24/2024 | 0 | 0 | 0 | 0 | 0 | 0.00 | 0.00 |
| 27 | Sun | 2/25/2024 | 42 | 57 | 17 | 0 | 0 | 0 | 8.14 |
| 28 | Mon | 2/26/2024 | 30 | 55 | 13 | 4 | 1 | 0.18 | 9.45 |
| 29 | Tues | 2/27/2024 | 31 | 49 | 10 | 3 | 1 | 0.73 | 9.29 |
| 30 | Wed | 2/28/2024 | 67 | 98 | 29 | 3 | 2 | 0.18 | 20.33 |
| 31 | Thur | 2/29/2024 | 35 | 61 | 13 | 3 | 2 | 0.43 | 13.34 |

Dailys | Weekly glance | Attendance

Angel Metrics (4).xlsx

File Edit Insert Format Help

Angel Everett

| | | QA | Tickets updated w/public | Tickets updated w/internal | Tickets Solved | Completed Call | Missed Calls | Call Duration | Weekly Productivity | Attendance % |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1/29-2/4 | 100% | 54 | 102 | 38 | 0 | 0 | 0.00 | | 40% |
| | 2/5-2/11 | 97% | 35 | 101 | 30 | 10 | 0 | 2.50 | 8.79 | 40% |
| | 2/12- | 93% | 119 | 238 | 75 | 11 | 1 | 3.44 | 8.03 | 80% |
| February 2024 | 2/19- | 59% | 62 | 265 | 62 | 16 | 7 | 1.85 | 6.93 | 100% |
| **Monthly Totals** | | | **270** | **706** | **205** | **37** | **8** | **7.79** | **7.92** | **65%** |
| | 2/26-3/3 | 88% | 163 | 100 | 60 | 13 | 6 | 1.52 | 7% | 80% |
| | 3/4-3/10 | | | | | | | | | |
| | Week 3 | | | | | | | | | |
| March 2024 | Week 4 | | | | | | | | | |
| | Week 5 | | | | | | | | | |
| **Monthly Totals** | | | | | | | | | | |
| | Week 1 | | | | | | | | | |
| | Week 2 | | | | | | | | | |
| | Week 3 | | | | | | | | | |
| April 2024 | Week 4 | | | | | | | | | |
| **Monthly Totals** | | | | | | | | | | |
| | Week 1 | | | | | | | | | |
| | Week 2 | | | | | | | | | |
| | Week 3 | | | | | | | | | |
| | Week 4 | | | | | | | | | |
| **Monthly Totals** | | | | | | | | | | |
| | Week 1 | | | | | | | | | |
| | Week 2 | | | | | | | | | |
| | Week 3 | | | | | | | | | |
| | Week 4 | | | | | | | | | |
| | Week 5 | | | | | | | | | |

Dailys | Weekly glance | Attendance

# EXHIBIT 26

March 4, 2024 Small Improvements One-on-One Record

novo + Create Jur

Home
Kudos
**1:1 Meetings**
Your Pulse Surveys
Your Reviews
Your Automations
Team
Company

Mon, 03/04/2024 01:00 PM 1:1 Meeting

### Talking Points

Angel Everett (You)

Add Talking Point

Lia Mebane

No Talking Points added by Lia.

### Action Items

Angel Everett (You)

Add Action Item

Lia Mebane

- [ ] Continue to add to integrations project and knowledge capture project and thank you for taking initiative on this

Add Action Item

### Meeting Notes

Lia Mebane 5 months ago

Please make sure to send a formal email to Janet/HR and cc Grant and any higher-ups that you deem necessary.. You're accountable for your productivity and not meeting metrics. If you have documentation of a need to take a leave of absence for medical reasons, please make this a priority and include the necessary Managers so that your requests be handled IMMEDIATELY rather than waiting and you continuing to be held accountable for your performance/attendance

We will not provide additional training and resources at this time for individual Agents that are not meeting metrics. Resources are available in the new Knowledge space and trainings are recorded. If you feel you need additional time to go over these trainings, I am happy to schedule some time for you to review, if you feel any knowledge gaps are missing, I am happy to submit knowledge requests to Training.

What's New
Help Center
Video Tutorials
Need Support?
Small Improvements

# EXHIBIT 27

MetLife Short-Term Disability Claim Confirmation, March 6, 2024

servicing.online.metlife.com/claimintake/claimintake/confirmation

MetLife | Justworks Employment Group, LLC

Welcome **Angella**

HOME MY ACCOUNTS CLAIM CENTER DOCUMENTS & FORMS

# Your Claim is Submitted

null Disability

## Your claim is filed.

Your claim number is **282403068102**. This information won't appear in the claims center until your claim is fully processed. **Be sure to keep it for your records.**

**We're sorry, we were unable to process your medical authorization form.** (It's us, not you.) Please **Click here** to fill it out.

HERE'S WHAT HAPPENS NEXT

Feedback

Mar 6 5:08

# EXHIBIT 28

March 8, 2024 Team-Wide Metrics Reduction Announcement

# onshore-communication

**chanelle** Mar 8th at 3:21 PM

📣 **Important Announcement: Weekend Shift Expectations** 🚀

As we gear up for another weekend, let's address our ticket metrics with renewed focus. It's essential to maintain high standards consistently.

We've observed a concerning trend of productivity scores falling below our benchmarks on weekends. This trend directly impacts our ability to meet service level agreements and deliver exceptional service to our customers. Therefore, it's imperative that we prioritize hitting metrics daily, ensuring we meet and exceed our targets even during weekends.

Starting this weekend and moving forward, we're implementing changes to optimize our performance. We're reducing **the required number of comments per hour from 10 to 7**, providing more space for you to focus on quality interactions with our customers. By placing emphasis on quality over quantity, we can elevate our service delivery and enhance the overall customer experience.

In alignment with this adjustment, we're instituting a focused approach for weekend shifts. Each agent will need to complete a minimum of 7 comments per hour, contributing to a productivity score of 7 or above.

Consistently meeting these benchmarks is non-negotiable for our team's success. If productivity benchmarks continue to not be met, corrective action may be necessary to ensure we maintain our commitment to excellence in customer support.

Let's approach this weekend with focus and determination. Together, we can deliver outstanding service to our customers.

cc: @lia.mebane @madeline

⭕ 1 ✅ 4 👍 1

# EXHIBIT 29

Hefferan Return-to-Work Email, May 13, 2024

Gmail A B <aevere04@gmail.com>

# Checking in - Claim 282403068102

1 message

**Janet Hefferan** <janet@novo.co> Mon, May 13, 2024 at 2:13 PM
To: aevere04@gmail.com
Cc: Angel Everett <angel.everett@novo.co>

Hi Angel,

I hope you are doing well. I just left you a voicemail, I am reaching out to check in about a return to work date for you. Your Short Term Disability claim is certified through May 17, 2024 so I'd want to make sure the team is prepared for you to return on May 20, 2024. As we previously discussed, we want to schedule refresher training and training on new products and procedures to set you up for a successful return. Please let me know if you have any questions or concerns.

Thank you,
Janet
--

novo

**Janet Hefferan**
Senior HR Generalist
janet@novo.co | novo.co
222 Broadway, 20th Fl New York, NY, 10038

# EXHIBIT 30

July 10, 2023 Mebane-Lawhorn Slack Exchange

Today

**lia.mebane** 12:44 PM

Hi @Lori Lawhorn Happy Monday!! I just finished my 1:1 with Angel and she mentioned to me about an interest in joining Compliance. Let me be the first to say, Angel would be a phenomenal fit to your Team. She's fastidious, thorough and efficient. I can always count on her to complete tasks in a timely fashion and she's a great Team player with infectious energy. I honestly would hate to lose her, but my focus has always been to cultivate this Team to pursue their goals and she comes highly recommended. I would be happy to set some time on the calendar with Angel, Madeline and myself, if you're open to having a further discussion about this,

New

**Lori Lawhorn** 4:40 PM

Hi @lia.mebane Happy Monday!

So I asked Edem about adding more people to compliance and it appears for now, they are not looking to make any changes. Since Dani & Sam left, there is new modeling of Legal, Compliance, Risk & Credit Risk. There is alignment already underway for Compliance to leverage the Legal Ops team more for support.

There have been lots of changes over here 👀 recently. But we shall see what the future holds! I had already mentioned Angel to Edem previously, and just again too, so she is on his radar. (edited)

**lia.mebane** 4:43 PM

I love that and yes things do change quickly around here, so please keep her in mind as again, she would be a great fit!!

# EXHIBIT 31

December 19, 2023 Krystal Velasco Slack Message

1

December 19th, 2023

**Krystal Velasco** 3:13 PM
@Angel Hi Angel, I wanted to let you know I used your stop payments for checks as example of work done to Grant and it was great! I made some minor adjustments , it looks like k & t updated the macro , i actually updated the macro again because of an incident we had with a north star ticket that went bad. Any one if you have any questions or it does not look right let me know, this is for physical checks. Job Well done !

1

1 reply 7 months ago

**Krystal Velasco** 7 months ago
@Angel Hi Angel, I wanted to let you know I used your stop payments for checks as example of work done to Grant and it was great! I made some minor adjustments , it looks like k & t updated the macro , i actually updated the macro again because of an incident we had with a north star ticket that went bad. Any one if you have any questions or it does not look right let me know, this is for physical checks. Job Well done !

1

1 reply

**Angel** 7 months ago
Hi, thank you!

# EXHIBIT 32

Lockout Photographs, MacBook and Chromebook, November 15, 2024


November 15, 2024
12:14 PM
This Mac is Locked
The system PIN is required to use this Mac.
This Mac has been locked by your organization.
To unlock, enter the system PIN or contact your administrator.

# Your device is locked

This device (SN [illegible]) was locked by the [illegible].co administrator

This device has been reported missing or stolen. For security reasons, it has been disabled. Please Return this device or report to [illegible] Fintech immediately at [illegible]



# EXHIBIT 33

Hefferan DocuSign Severance Transmission, November 15, 2024, 12:34 PM

Delete Archive Report Move to Reply Zoom

# Complete with Docusign: Angel Everett - CIIAA (1).pdf, Severance Agreement Angel Everett (2).docx

J

Janet Hefferan via Docusign<dse_NA3@docusign.net>

To: You

Fri 11/15/2024 12:34 PM

This message is from a trusted sender.

novo

Janet Hefferan sent you a document to review and sign.

**REVIEW DOCUMENTS**

**Janet Hefferan**
peopleops.us@novo.co

Hi Angel, please find your separation agreement included here.

Please review and sign at your earliest convenience.

If you have any questions, please don't hesitate to reach out.

Thanks,
People Ops

Powered by docusign

# EXHIBIT 34

Hedges Termination Email (Novo Transition & Next Steps), November 15, 2024, 12:49 PM

Outlook

## Novo Transition & Next Steps

**From** Patrick Hedges <peopleops.us@novo.co>
**Date** Fri 11/15/2024 12:49 PM
**To** aa.everett@hotmail.com <aa.everett@hotmail.com>
**Cc** Janet Hefferan <janet@novo.co>

2 attachments (227 KB)
Leaving Novo - Contact Information (6).pdf; Leaving Novo - FAQ Resource (US) (6).pdf;

Hi Angel, This email is to inform you that on November 15th, Novo conducted a reduction in force and your role was impacted. Today will be your last day at Novo.

We understand that you are currently on leave and would be happy to make ourselves available for any questions you may have.

**FINAL PAYMENT, EQUITY & EXPENSES**

You will receive your final paycheck on November 15, 2024 and subject to applicable withholdings and deductions.

You will have 90 days from your last day to exercise any vested stock through Carta. If you have any recently submitted expenses please let us know. Should you have any questions regarding your paycheck, equity, or expenses please reach out by emailing accounting@novo.co.

**SEPARATION DOCUMENTS**

We'll send the Novo Termination Certificate via DocuSign as well. This document was part of your original offer letter and is part of the company's transition process for all departures.

**SYSTEMS ACCESS**

Your access to your Novo email and company systems will be rescinded momentarily. At that point, you will not be able to access any Novo-related systems or information.

**EQUIPMENT & PERSONAL ITEMS**

If you need us to provide a FedEx label to return your device or any other company property, please let us know.

If you have any personal items in the office you'd like shipped back to you please respond to this email and we'll ensure these are returned promptly.

**BENEFITS & JUSTWORKS ACCESS**

Any healthcare benefits including medical, dental, and vision will remain active through November 30th, following which you will be eligible to enroll in COBRA coverage. You will retain access to Justworks and be able to download past pay stubs and tax documents.

Please review the attached PDF resources (Leaving Novo FAQ, & Contact List) and the Justworks support page for additional information.

**CONTACT INFORMATION**

If you have any questions please don't hesitate to reach out to the people team by emailing peopleops.us@novo.co. Additionally, should your personal contact information change including email, phone number, or address please let us know so we can ensure that you receive all relevant notices and documents from the company.

Thank you again for your commitment to Novo, we appreciate all your time and effort.

Best,
People Ops